**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

Younes Kabbaj,
      Plaintiff

v.

Google Inc. (a Delaware Corporation),
Amazon Inc. (a Delaware Corporation),
Yahoo Inc. (a Delaware Corporation),
John Does 1-10,
      Defendants

**CIVIL ACTION No.**

## COMPLAINT AND JURY DEMAND

1.  Plaintiff seeks declaratory and injunctive relief, and money damages for defamation, tortious interference with contract, negligent and intentional infliction of emotional distress, premised upon diversity of citizenship.

### The Parties

2.  Younes Kabbaj is US citizen and resident of Morocco, temporarily located in Florida.

3.  Google Inc. is a Delaware Corporation, certificate attached as **Exhibit 1**.

4.  Amazon Inc. is a Delaware Corporation, certificate attached as **Exhibit 2**.

5.  Yahoo Inc. is a Delaware Corporation, certificate attached as **Exhibit 3**.

6.  John Does 1-10 are unidentified individuals operating Google, Amazon and Yahoo internet facilities to author/publish defamation and threats concerning Plaintiff.

### Jurisdiction and Venue

7.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. 1332 because the amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs, and there is diversity of citizenship between Plaintiff and the Defendants.

1

This Court also has supplemental jurisdiction over the claim for relief that arises under Delaware law pursuant to 28 U.S.C. 1367(a) because it forms part of the same controversy and derives from a common nucleus of operative facts.  Venue is proper in this District pursuant to 28 U.S.C. 1391(b)(3) because the Defendants are subject to personal jurisdiction in the District.

### The Facts

8**.**  Starting approximately February of 2009, Plaintiff has been subjected to a prolonged campaign of defamation after accepting a job as IT Technician, Head of IT for the American School of Tangier and Marrakesh (herein identified as "AST," also a Delaware Corporation, certificate attached as Exhibit 4).  The subject matter of the defamation is covered in previous litigation in Morocco, as well as Case no. 10-431-RGA and Case no. 12-1322-RGA (Delaware District Court), and Case no. 11-23492-MGC (Southern District of Florida).

9.  Previous litigation against a suspected John Doe named Mark S. Simpson is captioned as case no. 12-1322-RGA, yet this litigation failed to yield identifying information concerning the John Does who authored/published website content hosted by Google Inc., Amazon Inc. and Yahoo Inc. (herein known as the "ISPs").  This litigation was dismissed on August 28th, 2013.  Plaintiff must serve the John Does and/or ISPs with a summons/complaint concerning this matter before the statute of limitations expires.  Plaintiff also has limited time to acquire evidence confirming the identities of John Does which authored the defamation published by the ISPs, as well as the death threat emails sent to Plaintiff.  All the defamation described in this Complaint targeted Plaintiff, his family in Morocco and the United States, and his previous employer AST which is also intricately tied to Plaintiff's interests.

10.  The subject of this complaint concerns defamation identical in content to that which was previously litigated in criminal/civil cases in Morocco and Delaware (10-431,12-1322), and which has again recently reappeared on the internet facilities of the ISPs complete with descriptions of Plaintiff's identity including his name, job titles including 'IT Technician,' or 'Head of IT' for American School Marrakesh.  The defamation accuses Plaintiff of being a heroin dealer, plotting terrorism, hacking, stalking, fraud, theft, death threats and other crimes, as well as false allegations that Plaintiff was a 'closet homosexual.'

11.  The defamatory postings cited in this Complaint are also made in violation of a confidentiality agreement reached between Plaintiff and AST in previous litigation 10-431-RGA, rendering that previous settlement agreement null and void and giving rise to the tortious interference claim cited in the instant Complaint.  An additional claim for breach of contract will be filed by Plaintiff once discovery confirms the identity of the John Does which Plaintiff is certain are parties released in the previous settlement agreement, which requires Plaintiff to get permission from Delaware District Court before initiating litigation against any of the releases named in the previous settlement agreement (Case No 10-431, Docket Entry 54).

12.  Defamatory and threatening communications concerning Plaintiff recently appeared in multiple books/articles/web pages hosted by Google and Amazon.  Most of the websites have since been deleted but some still remain active.  Several of the websites administered by Google's "Blogger" service were located at the following website addresses and corresponding 'blogger' and 'Google+' profile pages:

A) http://www.draculadancing.com
B) http://www.whitmanandrimbaudkissing.com
C) http://www.whitmankissingrimbaud.com
D) http://www.kerouacandrimbaud.com

3

D) http://www.blogger.com/profile/10595979589183199636 (Attached **Exhibit 38**)
E) http://www.blogger.com/profile/03299136927808961600 (Attached **Exhibit 39**)
F) http://plus.google.com/102751852946887364961 (Attached **Exhibit 40**)

_**Defamation and threats published by Google Inc. internet products and news blogs**_

13.  The following URL's attached to Complaint are relevant to the instant proceedings:

Exhibit #
05) www.draculadancing.com/2012/07/location-la-localisation-des-evenements.html
06) www.draculadancing.com/2012/07/evil-characters-in-fiction-mal.html
07) www.draculadancing.com/2012/09/mark-fish-pretend-headmaster-of-kew.html
08) www.draculadancing.com/2012/09/the-american-school-of-marrakesh.html
09) www.draculadancing.com/2012/09/the-cause-of-my-traumatic-stress-quest.html
10) www.draculadancing.com
11) www.ilga.org/ilga/en/countries/MOROCCO/Your%20Stories/a8b4f56b-4095-43e5-a3a1-694edbffc5c5
12) www.whitmanandrimbaudkissing.com/2012/11/dan-fingermans-wonderful-gay-play.html
13) www.kerouacandrimbaud.com/2012/11/caveat-emptor-when-it-comes-to-helping.html
14) www.kerouacandrimbaud.com/2012/11/okay-re-introduction-to-you.html
15) www.kerouacandrimbaud.com/2012/11/testing-our-own-limits-of-forgiveness.html
16) www.kerouacandrimbaud.com/2012/11/on-being-writer-few-reflections.html
17) www.kerouacandrimbaud.com/2012/12/advice-from-my-desk.html
18) www.kerouacandrimbaud.com/2012/12/most-homophobic-or-anti-gay-people-are.html
19) www.kerouacandrimbaud.com/2012/12/i-dedicate-this-to-nurse-who-took-her.html
20) www.kerouacandrimbaud.com/2012/12/the-world-beyond-our-control.html
21) www.kerouacandrimbaud.com/2012/12/hypothetical-but-fear-producing.html
22) www.kerouacandrimbaud.com/2012/12/no-personal-emails-please-pas-des.html
23) www.kerouacandrimbaud.com/2012/12/for-gay-man-self-love-take-years-i.html

14.  Below are defamatory excerpts from the above Exhibits, including statements that

identify Plaintiff by name, job title, and terms like 'Moroccan criminal, felon, wingnut,' etc:

**Exhibit 5**
**A.**  "At the moment, I am writing a story about the criminality I found at the American
School of Marrakesh.Do I change the locale or maintain it?Its not as if people don't know
where I have worked? To inherit a school where a known felon is head of maintenance, a
man formerly incarcerated for heroin trafficking in the United States is in charge of IT"
**B.**  "Especially, considering the lengths to which these characters and others ... strangely
shaped and weirdly behaved Moroccan "aristocrats" threatened me with photos and
emails (of my own) ... went to stop me from revealing anything."

**Exhibit 6**
**A.**  "In Morocco, as you know, I encountered a horrible man (Younes Kabbaj), a criminal
with a felony conviction, an animal who sent me photos (now in the hands of the French
authorities) of him and his prison / gang friends with guns, a man who infiltrated all of
my email and other private accounts, twisting things to make me look terrible, all with

the end of destroying me. As a human being, the experience gave me PTSD (for which someone is going to pay). However, as a writer, it gave me deep perspective. Why? Because amoral, evil, unscrupulous, unethical, mean and valueless characters, such as the Morocco criminal who was the IT Technician at the school where I worked (The American School of Marrakesh), pose the greatest challenge to writers. They are nearly impossible for writers to paint with dimension and accuracy, because ... quite frankly ... most of us don't understand how someone could do such things. Would you read someone else's most private correspondence? Hand it off to others so they could say, "We know about the email to Germany." I finally figured out they meant an email I'd sent to a gay friend who's a tram conductor in Berlin!"

**B.**   "Critics all agree that Vautrin's obvious sexual attraction to Rastignac and Lucien speaks to his repressed homosexuality; he is bound to them by his hunger for power but also his hunger for them , which is precisely the case with my own Moroccan criminal."

**Exhibit 7**
**A.**   "Not my driver nor the criminal IT Technician named Younes Kabbaj, whom we were driving to Casablanca for who knows what nefarious activity, cared at all"
**B.**   "I had every possible form of privacy violated: email, general internet, phone, my own home ... in which spying devices were installed. I saw a holiday dedicated solely to the slaughter of sheep, in which my own bodyguard (the Head of Security for Alexander the Great) confessed to being tired after killing so many sheep and cutting them up. Morocco is filthy, backward, disgusting, corrupt (oh, so corrupt). The police demand bribes at every roadblock, the government is full of hideous "Royals," who live the golden life, with jet skis, lavish parties, toy-boys, et al. Do not go to this backward and disgusting country. Do not patronize their hotels and resorts. Avoid Morocco at all costs. Boycott it. It is NOT gay-friendly (being gay is, in fact illegal, and you will, as a friend of mine was, be beaten either to death or nearly), it is hideously sexist, and quite frankly it makes Tijuana look like Oslo. There ..the truth. As Zola would say, "Do something now."
**C.**   "He is a sham, a fraud, a shopping mall Santa Claus pretending to be something far beyond his intellect and acumen. I had the misfortune to be recruited by him to go out to the American School of Marrakesh ... and then he was fired for incompetence by the board (not coming to school, behaving erratically, sending contradictory instructions, spending lavishly on his apartment, car, etc.). His departure left me high and dry, with no instructions, no guidelines, no playbook ... nothing but an unaccredited school, with two criminals in its employ, and students who couldn't speak English. Ultimately, the American School of Marrakesh destroyed my career and health, thanks to this total sham Mark Fish"
**D.  Comments:**
   **1.** "Anonyme 4.8.12 - Amen. The guy is a complete fake. I worked in Tangier when he was there and we used to call him 'the invisible man,' because you could never find him. I swear he's mentally ill."
   **5.** "MarkSutherlandSimpson8.8.12-I know you meant know-nothings .but I agree utterly. Carney, Sandoe does play favorites and they do NOT do their research of

candidates properly. It's all a shell-game. The only thing worse is Search Associates and that homophobic dinosaur John Magagna, who owes me big time"

**6.** "Mark Sutherland Simpson 8.8.12 - In answer to questions I've received, John Magagna refused to allow Search Associates to represent me (thus eliminating hundreds of job opportunities) because of gossip about me having an affair with my Head of Security (and chaffeur, and the gardener, and ...). To make matters worse, he repeated the stories, as I have heard directly from others. Yes ... indeed ... he owes me, and big time is an understatement."

**7.** "Anonyme 8.8.12 - I work in Tangier, and this man, Mark Fish, was mean for me. He was yelling at me once, because it is alleged that I did not clean the stairs, and I did clean the stairs. He is a liar, no one dearer to him in the whole school, including the Eastman Eliza. Everybody hate him."

**Exhibit 8**

**A.**  "Many of you write me every day, and most of you wish to remain anonymous. The reason seems to be the Islamic component, and fear of Younes Kabbaj, the former IT technician at the American School in Marrakesh (as well as a former convicted and imprisoned felon in this country for heroin trafficking). Your fear may be well-founded, because he might be able to discern your address. I don't know. You write every day, asking for my story … and because you worry about me, which I appreciate immensely"

**B.** "Ultimately,out of sheer fear,I resigned my position with the agreement that would not talk about what I discovered at the school as long as school didnt talk about me.However, no sooner had I left for Paris, than I was barraged by threats and death-threat emailing's from Younes Kabbaj (including photos of him and his prison chums with guns)"

**C.**  "Of course, he proceeded to infiltrate my life in every way possible, getting on to my Facebook page and pretending to be me or at one point a woman named Victoria Olemma (who knew me from a university I never attended. Hmmm). He contacted former students, made postings in my name … and the same with my blog, snipping bits and pieces from my computer (to which he had access in Marrakesh, because he was literally inside of it), email and other correspondence. At one point they claimed I had affairs with everyone from several of my chauffeurs, my Head of Security, teachers, and anyone who was male and moved. They claimed to have a Flash Drive with my salacious writings on it, which could only be the short stories and manuscripts obtained from my computer ... and altered beyond recognition by now.  Again, people who know me, none of that nonsense would never be true. Yes, I am being treated for PTSD; yes, Younes Kabbaj, Mark Fish, Steve Eastman, possibly the head of a major search agency, and the American School of Marrakesh are the cause of it. There ... I'm exhausted, but maybe I won't need to write a version of this every morning!"

**D.  Comments:**

**1.** "Anonyme 8.8.12 - You poor guy. That Kabbaj character sounds like other people I've heard about from that part of the world. They have no values at all, and no respect for privacy. I hope to heck you plan to sue him and them, and whoever that Search Agency is. Search Associates? I believe I read about the head of that organization in one of the comments about Mark Fish."

6

**2.** "Mark Sutherland Simpson 9.8.12 - Thanks for the support, and thanks especially for asking that you be printed even if anonymously. Considering the characters and country we dealing with, that brave of you! Kudos and thanks!"

**3.** "Anonyme 11.8.12 - Dude, I'm SO, SO sorry for you! But you should have done year research man, because that place is famous in Marrakesh for being corrupt. My girlfriend and I lived in Marrakesh for about a year, and EVERYONE in the city knows that the American School is fool of crooks and even murderers (or so Cafe de la Poste gossip claims.) My girlfriend is yelling at me to tell you to keep your chin up and count yourself lucky that you got out of that hellhole alive! What a screwed up, f-ed up country. You can watch naked French music videos and listen to the prayer tower things at the same time?!?!

**4.** "Anonyme 2.9.12-Whoa. I just read this and it totally gave me chills. I've heard of people having things stolen in Morocco,and of lots of corruption,so this doesn't surprise me. However, some of these people should be brought before the police, shouldn't they? Isn't that Mark Fish guy a criminal? What about this Eastman character? He gave permission for spying on employees? Holy whatever. I'm with you, Mark, and I'm so sorry this happened to you. But keep the faith. They'll all get their come-uppance. Evil and stupid people always do. Sean Eastbourne"

## Exhibit 9

**A.** "While there, I encountered an individual named Younes Kabbaj, a man who was at the time the School's IT Technician and was spying upon everyone's emails, phone calls, faxes, etc., (teachers, administrators, students, employees), monitoring everyone's computers, installing listening devices in teachers' homes, and intruding directly into our computers via modem. He obtained access to all of my accounts and to all of my contact lists. He managed to intrude into my account at Carney, Sandoe, the Independent School Placement Agency. You imagine, logging into Facebook or your blog and discovering that you are ... already logged on, and that this monster has been falsely pretending to be me. It's hellishly unbelievable and beyond any ethical boundary I have ever encountered in my life. Rightly or wrongly, I chalk it up to his religion, which seems completely amoral to me, appearance, sham, ritual, pretense and ... nothing behind it; nothing but mumbo jumbo. Religion or not, Mr. Kabbaj is an evil man, a criminal, who spent three years in an American Federal Penitentiary for Heroin trafficking"

**B.** "Toward that end, I have taken the advice of authorities and worked to shake him off. I have turned over to them his emails to me, in which in threatened with me death and included photos of himself and his prison friends with guns, including Kalashnikovs. Think doesn't scare the Hell out of you? Think again, my friends ... you ought to read them or see them. You'd be beyond shocked. Even the French authorities passed them around in horror, shocked that anyone would be so foolish as to send out such incriminating emails, which were ... of course, traced by the French DGSE immediately back to the originating ISP"

**C.** "He has been after me because, incorrectly, he believes I fired him and then wrote a letter to the parent body about him. I did neither. The Board of Trustees fired him (against my advice, by the way) for gross misbehavior and violation of the school charter,

and the letter to parents was written and distributed while I was in New York, and not even in Morocco. So, his entire campaign of destruction of my life has, as has so much in his life, been based on nonsense."

**D.**  "I moved locations continuously on advice of French and American authorities, I cut off contact with anyone from my past including friends from childhood and unfortunately witnessed death and mayhem …something I had never or could ever have anticipated."

**E.**  "I ask Younes Kabbaj, directly, to please leave me the Hell alone. I never fired you, I never sent out a letter about you (Moulay Omar and Madison Cox orchestrated that, using my digital signature, obtained from my office), I never offered you a hint of the calumny, libel and disgrace that you have shoveled upon me. Yes, I am gay. Being gay does not make you a pedophile, a pervert, or any of your other silly. salacious, and defamatory concoctions. In my country, it's an ordinary thing to be gay; it is not ordinary to destroy someone's life in order to achieve some vague personal revenge. That's called criminality, lack of ethics, and abnormal personality type. You're a wingnut on speed, Kabbaj (or is it Cabbage?), a total and complete demon. To the rest of you here, and the thousands of you who have already started reading this blog, thank you for your support. Thank you for reading my blog. Thank you for buying my books ...it keeps me going in the face of evil."

**Exhibit 10**
"Mark lives in a world of silence, unable to communicate with more than two or three people. We go to extreme precautions when speaking with him, and security is strong at all events. His life has been completely invaded electronically and in other fashions, by a criminal of Moroccan origin with a profound psychological problem of some religious/ sexual sort. He has written letters to Mark's friends and associates, asserting the most astounding nonsense, co-opted Mark's accounts, faked accounts, tricked, deceived, distorted and ultimately threatened him with death. Mark lives in a shadow world and always will. Our hearts go out to him each and every day. We work closely with the Australian, French and American authorities, all of whom are documenting this criminal's violations of laws regarding invasions of privacy, defamation of character, libel, harassment, cyber-bullying, stalking and infliction of mental distress."

"Because Mark lives in a world of silence, unable to communicate with more than two or three people. We go to extreme precautions when speaking with him, and security is strong at all events."

**Exhibit 11**
"The major event that occurred; and for which I had no participation - a dual national (American and Moroccan) person was fired by the Board of Directors. Sadly for me, this religious fanatic and true homophobe, decided to focus his intense revenge on me - for three years now. He sent communications to schools I applied to; contacted the agency that represented me and put out terrible lies; most notably that I was a pedophile. Needless to say, in the world of education, even a lie about that issue ends your career. He didn't stop there. He stalked me on email, Facebook and my blogs; he had infiltrated my computer in Morocco and obtained my contact lists and has also written 30 page diatribes about me; or in some cases pretended to be me – writing to former students

saying I was sexually interested in them. I have continuously relocated around the world, concerned about my personal safety."

## Exhibit 12
"Unfortunately, one thing that occurred; and for which I had no participation - a person was fired by the Board of Directors. Sadly for me, this person focused his homophobic revenge on me. He sent communications to schools I applied to; contacted the agency that represented me and put out terrible lies; most notably that I was a pedophile. Needless to say, in the world of education, even a lie about that issue ends your career. He didn't stop there. He stalked me on facebook and my blogs; he had infiltrated my computer in Morocco and obtained my contact lists and has written 30 page diatribes about me; or in some cases pretended to be me – writing to former students saying I was sexually interested in them. I have continuously relocated around the world in order for him not to find me, as I am concerned about my personal safety."

## Exhibit 13
**A.**  "However, in the course of my last job, I was targeted by a sociopathic IT technician who, after being dismissed from the school for very, very good reasons, became my stalker, harasser and career-destroyer."
**B.**  "This is my author page on Amazon, of which I am also proud. My stalker/harasser posts the bad reviews, and I am sorry about that. They are embarrassingly transparent, grammatically flawed and clearly harassment (they've been documented). It's just another attempt to intimidate me."
**C.**  "I think he thinks I slandered him through my various police reports (In France you have to write things down, beginning with "J'atteste sur mon honneur) or on my blog, but since he was inside my blog (he is a hacker, as well, a former IT Technician) I'm not sure who could believe anything from my previous blogs. This one is safe ... and well monitored. Anyway ... final word, be careful about playing with matches."
**D.**  "To any former student, colleague or friend that was either directly or indirectly harmed by this homophobic villain– you have my most sincere and heartfelt apology. The pain I have felt; the suffering I have endured; and the toll I have paid for this person's incredibly cruel acts should never have burdened your lives. I miss staying in touch with all of you – however, your well-being is paramount to me. I think of each of you everyday, and I hold you close in my heart and in my prayers."

## Exhibit 14
 "Unfortunately, in the course of my career I ran afoul of a sociopathic individual who, after being dismissed from school employment, destroyed my career and my life. He invaded every inch of my privacy: email accounts private AND professional, bank accounts, Facebook, every single account I had, and he even invaded the Trinity School server, without their knowledge. From my contact lists and his infiltration into the website of Carney, Sandoe, a placement agency, he sent out the most disgusting and repugnant long (VERY long) emails, about me being a pedophile (HARDLY, since I've

never glanced at a man younger than thirty-five and hairy chested ... well, okay, an exception or two on the hairy chest)"

## Exhibit 15
 "There is only one person in the world for whom I might use the word hate, though I would more accurately say detest. This is a person who willfully and with full knowledge of his actions, violated my private email, banking, Facebook, and other accounts, wrote long letters filled with lies as well as with information he obtained through violation of my privacy ... and who has harassed and stalked me for three years. However, I am not at ease with feelings such as I have for this scoundrel, amoral and criminal though he is. To have violated my privacy, something everyone holds sacred, then to manipulate and use it to interfere with my employment is a criminal offense in the United States. I pray for the strength to see this criminal face justice here or upstairs, when he comes face-to-face with the big guy."

## Exhibit 16
 "Then, after my Amazon page was infiltrated and my reviews tainted by my stalker / harasser, I lost out on a film option ... the friend working with me on that got scared away by my stalker / harasser's apparent religion and the photos I'd shown her. SO ... no film option at the moment, which is too bad, because we were talking big bucks. But people are afraid of my stalker / harasser. As my shrink said, "You've been blackballed." No one wants to touch the "thing" connected to a particular religion. I'm a relatively unknown Salman Rushdie. Really. I should be on Katie Couric's show, which was also my shrink's advice ... to go public in every way about being stalked and harassed, TV and newspaper, the works. However, I've moved on ... trust me, after the Hell of the last three years, caused by an internet stalker / harasser who was fired for good reason from the school of which I was Headmaster, invaded all of my accounts, email and otherwise, including Facebook, and then having violated my privacy used some of that information to interfere with my employment (he also had access to my referees and the my site on the placement agency web), well ... I can weather storms (and illegal criminal mischief)."

15.  Defendants continue to defame Plaintiff with additional Google articles attached as

the following exhibits:

    A.  "Advice from my desk .." attached as Exhibit 17
    B.  "Most homophobic or anti-gay people are gay ... true" attached as Exhibit 18
    C.  "I dedicate this to the nurse who took her life in London ..." attached as Exhibit 19
    D.  "The world beyond our control ..." attached as Exhibit 20
    E.  "Hypothetical, but fear-producing" attached as Exhibit 21
    G.  "No personal emails, please …" attached as Exhibit 22
    H.  "For a gay man … self-love takes years" attached as Exhibit 23

16.  Defendants also describe their motive for wanting to harm Plaintiff as derived from

discriminatory hatred of Arabs/Muslims, attached as additional posts:

Exhibit 24) www.draculadancing.com/2012/07/lets-talk-about-hypocrisy-allez-y-et-de.html
Exhibit 25) www.draculadancing.com/2012/08/the-new-dangers-of-writing-les-nouveaux.html
Exhibit 26) www.draculadancing.com/2012/08/i-support-israel-completely-je-soutiens.html
Exhibit 27) www.kerouacandrimbaud.com/2012/11/israel-shares-our-values-we-are-family.html

### _Defamation and threats published by Amazon Inc. internet products and books_

17.  Defendants created several Amazon.com accounts whereby they published/sold

defamatory novels about Plaintiff using a variety of different titles and author names, as follows:

A) www.amazon.com/M.S.-Simpson/e/B0056TK2XU
E)  www.amazon.com/author/marksutherlandsimpson
B) www.amazon.com/Campbell-George-Cardeston/e/B0088NNPZ8
C) www.amazon.com/C.-Alcuin-Becket/e/B009V1BYMW

18.  Defendants published a 146 page novel originally titled "Satan in a Donkey Cart"

and then renamed "Mythical Sex in Marrakesh," "Drink Fire of the Sunshine" and "Core of a

Sinking Flame," all of which contain excerpts and references to Plaintiff that defame him with

allegations identical to those appearing on the Google sites referenced previously, including the

following excerpts from various versions of these books:

### Exhibit 28
**Page 10:**  "Nine months of hell in bestial, backward, barbaric Marrakesh (forget the
tourist brochures, the place is grotesque) ended with her reputation destroyed. This was
not hyperbole, it really had been destroyed, not sullied, but shattered beyond recognition,
after her nemesis - the kook, as he came to be known - copied and sent out, using her own
address book (which included friends, foes, former employers, colleagues, parents,
nieces, grandparents, Banana Republic, Air France, literary agents, etc.), emails and
phone call transcripts (yes, he monitored and recorded her phone - it's doable), along with
his sadistic sexual mythologies about her love life and excerpts from the short stories he
(from his point of view) fortuitously found on her computer desktop. He gained access
via a proxy server in Spain (that's doable too) and the router in her living room, which
apparently he had programmed and thus controlled. Her internet router was the kook's
best friend. Worst of all, her public humiliation continued, despite her precipitous
departure from Morocco. The flabby, sex-obsessed computer technician hadn't stopped.

There had been another barrage last night. He still haunted her - he might always haunt her. Ophelia knew she'd never had sex with a one-eyed Egyptian pilot named Omar, who tied her up with her own bra and took her in ways she'd never heard of (though some did sound interesting, she had to admit); she knew she never picked up three rough Berber men in the Medina and brought them home for a searingly sleazy four-way - but her grandmother didn't. Her mentally ill nemesis still managed to get access to her personal codes and bombard people with his garbage, changing his own account names frequently enough that people didn't delete them unopened or have them slithered directly into spam folders. He was as clever as Satan, the kook- no, he was Saran. And nothing and no one in hideous Marrakesh had either been able or prepared to stop him, not lawyers, not the apparently well-equipped Gendarmerie Royale - nothing.  For all she knew, he worked for them or was related to the Wali- or someone else

**Page 16:**  "Though she had sampled more of the danger than the deliciousness, thanks to the obsessive desires of the school's computer technician, whose name in Arabic sounded both feminine and vintage, as if he were a female character from an I Love Lucy episode - though she never repeated his name, not even to people who already knew it (even if it could evoke laughs), and his last name also rhymed with a humorous vegetable, but that too was best left unspoken. Certain things just shouldn't be said aloud and, really, he was Satan. At first, she'd thought he was merely a pot-bellied kook (well, he was a kook and he did have a potbelly) with his scraggly beard and drug-glazed eyes, who asked her out ten times in three days and turned up twice at her apartment. But he turned out to be more than that - much more."

19.   Excerpts from alternative versions of the above-referenced book can be found in the

"Mythical Sex in Marrakesh" novel sold on Amazon.com, where the John Doe defendants are

clearly referencing Plaintiff by name as attached as **Exhibit 29**:

**Exhibit 29**
**Page 20:** "… episode - though she never repeated his name (Eunice), not even to people who already knew it even if it could evoke laughs, and his last name also rhymed with a humorous vegetable, but that too was best left unspoken (Cabbage). Certain things just shouldn't be said aloud and, really, he was Satan."

20.   Defendant Simpson clearly intends "Eunice Cabbage" to be interchangeable with

"Younes Kabbaj."  The authors of this defamation also mock Plaintiff's name in similar fashion

in other defamatory postings where they claim to own a cat named "Cabbage," attached as

**Exhibit 30**.  Reviews of Mythical Sex in Marrakesh are attached as **Exhibit 31**.

21.   Defendants also maintain their Google blog feeds on the various Amazon and Google profiles, where the original defamatory exhibits attached to this Complaint are also republished on Amazon Author pages and Google+ Profile feeds, and redistributed to various different mass communication email lists including RSS feeds.  Attached as **Exhibit 32** are assortments of the various snapshots taken of these various Amazon author pages and biography pages over the time period starting approximately June of 2012, where it is clear that the Defendants constant changing of identities is so prolific, it could not serve to improve book sales but only to evade detection for activity that the authors are aware is clearly illegal.

22.   Attached as **Exhibit 33** is another recent (August 2013) snapshot taken of the Defendants Amazon author page and biography which changes almost daily.  Again the Defendants are illegally accusing the Plaintiff of the same false allegations including:

"predatory internet attacks, including identity theft, impersonation, scandalous slander, libel and assault, watching himself caricatured on obscene and dishonest web pages, enduring co-option and hijacking of every personal account, seeing his blogs inundated with embarrassing hacked postings either made up or purloined from Simpson's private emails, having his social media compromised and people contacted under false pretenses, having his contact lists used to send out scurrilous, libelous and slanderous mass mailings, and watching helplessly as his computers were pirated."

These posts appear just for a day or two before being deleted and republished and deleted, countless times over the course of years, without Plaintiff ever being able to properly ascertain the source of the John Does behind the defamatory publications, although they are being facilitated by Google, Amazon and Yahoo consistently for years.

***Additional relevant content***

23.   The postings made to these blog sites are too voluminous to add as exhibits to the Complaint, as many of the postings were edited multiple times and during certain periods the

13

postings reached approximately 20+ postings a day.  Many of the postings also provided clues to

the identities of the John Does.  For example, in one post made in a book sold on Amazon, the

John Does make reference to an individual named Pierre Berge, a former Board Member of AST

(and releasee named in previous settlement agreement) who Plaintiff is informed and believes is

one of the suspected John Does responsible for the recent defamation campaign.  This post

concerning a eulogy given by Pierre Berge at Yvess Saint Laurent's funeral is described below:

> **Exhibit 34:** "Yes. Somewhere. I only have virus-ridden flash drives now. I had to throw
> away my laptop, it was so infiltrated by the straggly-bearded kook that it was basically
> his ... and half the world. Anyway, the eulogy and probably a Trojan horse virus are on
> one of the flash drives, I think." "Find it for me, if you can, Phee. It was so beautifully
> written, like Pierre Berge lamenting Yves St. Laurent ... though between us Pierre Berge
> has completely lost his marbles of late, if he ever really had any that mattered. Your
> eulogy was the most moving Moment in Vanessa's funeral."

24.   Another article published by the John Does make reference to another individual

named Madison Cox, who is a current Board Member of AST (and releasee from the previous

settlement agreement) who Plaintiff is informed and believes is another suspect John Doe

defendant in this case.  This article is attached as **Exhibit 35** at URL:

www.kerouacandrimbaud.com/2012/12/madison-cox-gay-landscape-architect.html

25.   Upon information and belief, the Defendants also engaged substantial email, internet

and telephone correspondence with numerous third parties that they corresponded with through

the Google, Amazon and Yahoo platforms, wherein the sole purpose was to defame and incite

violence against Plaintiff and his family, for which they have succeeded as Plaintiff's family

received death threats regularly as a result of this criminal incitement,  Plaintiff's cousin was

illegally kidnapped/detained/tortured by the Moroccan military for 6 months in a Marrakesh

prison due to matters related to this litigation.  Two of Plaintiff's second-cousins have also been

14

kidnapped by the Moroccan military and are still in their custody as a result of this conflict which is being manipulated on these defamatory blogs.  It is necessary to identify the sources of these communications because these John Does are also responsible for a host of other criminal actions that have been taken against Plaintiffs family in the US and Morocco since 2009.

26.  As is clearly shown in the comments section of **Exhibit 7 and 8** and other posts, this defamation was also deliberately targeted to reach individuals associated with AST (a Delaware Corporation) with whom Plaintiff has a previous settlement agreement concerning previous identical defamation that was litigated in case no. 10-431-RGA.  This new round of defamation is clearly targeted to reach AST affiliates in both America and Morocco.  In **Exhibit 7**, two comments submitted to the offending blogs which were then posted in the comments section are alleged to have been written by employees of AST, confirming that the Defendants are clearly reaching AST employees and affiliates around the world with this targeted activity.

27.  The attempts by John Doe defendants to target AST (a Delaware Corporation) and their affiliates all over the world is deliberate because the offenders are clearly aware this type of threat against Plaintiff via AST causes direct physical harm to Plaintiff's family in Morocco by forcing his family into continued and sustained conflict with the Moroccan military officials implicated in misconduct concerning these matters.  The kidnapping and torture of Plaintiff's cousin was covered by numerous media organizations in Morocco, as his abduction and unlawful incarceration came about after numerous unsuccessful attempts to settle a multitude of criminal/civil cases related to these matters.

28.  Defendants also targeted their defamation of Plaintiff at specific internet forums intended to reach Moroccans and other individuals associated with AST, such as this entry they

posted on yet another internet site targeting readers specifically located in Morocco, attached as **Exhibit 11**.  Defendants also post messages on the Google blogs specifically targeting students at AST, as is shown in other posts attached as **Exhibit 12**, despite the fact that the blog authors are aware these sites are not appropriate viewing for children.

29.  Defendants also falsely accuse Plaintiff of suffering from repressed homosexual dysfunction, manifesting in some obsession with stalking homosexuals.  All these false claims published by the Defendants are also defamatory because they assert Plaintiff is committing infidelity against his female companions by cheating on them with members of the same sex. Women clearly have a right to know if their significant other is experiencing same-sex attractions, especially if such proclivities factor into providing consent to engage in sexual relations.  The type of women that Plaintiff has had relationships with would never engage sexual relations with a bi-sexual or homosexual man, so malicious allegations by the Defendants accusing Plaintiff of being homosexual are akin to accusing Plaintiff of committing infidelity against his significant others, or of having some loathsome disease (as many women see homosexuality as a type of loathsome psychological disease like necrophilia or pedophilia).

30.  Defendants also openly states that the religion of Islam completely disgusts them (disregarding that Plaintiff is inclusively Jewish/Christian/Muslim), and they provide hundreds of pages of literary content that give clear insight into the minds of the John Does regarding their motivation for wanting to harm the Plaintiff based upon a false claim that he is some type of Islamic super-militant radical on a mission to kill all gays.  It was already established in previous litigation that Plaintiff will only consider assassinations of individual gay rapists/pedophiles that

16

specifically attempt to commit sexual-themed crimes directly against him.  Several posts by

Defendants admit bias against Plaintiff because of his religion attached as **Exhibit 36** by stating:

> **Exhibit 36**
> **A.**  "I'm a normal person, in that I amnot free of certain prejudices or biases.  I admit this
> upfront. I believe everyone is biased. For me, my chief problem is with Islam, which I
> cannot abide. I'm working on it."

31.  Defendants publish large amounts of soft-core pornography (that they declare to be

art) depicting young men in various stages of nudity with private parts visible, and videos of

sexual groping and kissing between men, including another blog titled kabukiandshirtless.com

(which has subsequently been removed), and others similar in content.  Defendants also author

graphic depictions of sex under the guise of 'literature' in numerous hardcover books and

internet products, and some drafts of the material include under-age sex, sex between teachers

and students, rape and other indecent acts.

32.  Defendants also operate RSS feeds of their Google/Amazon products where

subscribers can receive their products and posts via email and other means, in real time as they

are posted.  This technical ability of Google/Amazon to disseminate the defamatory content

thereby allows for mass distribution of these products to thousands of people.  Subscriptions

surpassed over 50,000 for some of the blogs before they were eventually deleted.

*__Defamation and threats published via Yahoo! Inc. internet products and/or email facilities__*

33.  Plaintiff also documented numerous emails hosted by Yahoo Inc. that purport to be

owned by the authors/publishers of the content appearing on Google and Amazon, including

'esprit_litteraire@yahoo.fr,'  'middle_mist@yahoo.fr,'  'roundmountainpress@yahoo.com'  and

others.  After litigation was filed against a defamation suspect, Plaintiff began to receive

additional threatening emails from Yahoo accounts linked to the Google/Amazon sites.

34. On December 4ᵗʰ, 2012, Plaintiff received an email from 'wilmslow_road@yahoo.fr' purporting to be from the author of the defamation using an email signature bearing the name Mark S. Simpson.  In this email, the John Doe author going by the name of Mark S. Simpson taunts Plaintiff and sends him a second email to stating he/she didn't send the first email, but that his/her account had been 'hacked' by Plaintiff.  Because this second email reply was cc'd to attorneys and Board member of AST, this email stands as an act of defamation on its own, as it falsely accused Plaintiff of illegally accessing email accounts operated by these John Does.  This is similar to the posts made on Google/Amazon that claim the authors did not publish the defamatory content appearing on the sites, but that their accounts at Google/Amazon were 'hacked' and that some unidentified third party (or Plaintiff himself) posted the content.

35. On April 7ᵗʰ, 2013, Plaintiff received an email death threat from 'messagetoyounes@yahoo.ie' referring to matters consistent with the theme of the defamation. This email is threatening Plaintiff with everything from death to false imprisonment.  This email also threatens Plaintiff with financial ruin and includes a threat against Plaintiff's mother, who the Defendants had illegally stalked and conducted surveillance against while she worked at a local strip mall.  After Plaintiff's mother resigned her position at the mall as a result of the threat, Defendants then left another death threat atop Plaintiff's mother's car.  Defendants had been conducted similar death threats against Plaintiff and his family for years since 2009.

36. On April 20ᵗʰ, 2013, Plaintiff received another death threat email from 'saint_joachim@yahoo.ca' referring to matters related to their defamation campaign.  The email references a threat that Plaintiff is on a 'hit list' of people that are being targeted by the Defendants with illegal subversive activities.  The existence of this list is verified as since the

18

moment Plaintiff had come into conflict with Defendants in 1987 (after reporting their leader for illegal molestation activity), these Defendants and their Hollywood supporters have thereby shadowed Plaintiff throughout his life for decades and launched many bizarre attacks against him for over 26 years since the conflict began.

37.   The Defendants have registered dozens of Yahoo email addresses showing a clear preference for this email platform and the sophistication/security it provides to engage these 'anonymous' illegal threats and defamation against Plaintiff. All these death threats have been forwarded to FBI without response due to the fact that the suspected John Doe defendants are clearly politically-connected as they claim in their blogs.  The Defendants have shown ability to suppress any federal investigation into their conduct confirming they have co-conspirators inside the US government helping them evade arrest by obstructing Plaintiff's attempts to report them. The previously described emails are attached as **Exhibit 41**.

### *Conclusion*

38.   ISP Defendants and John Does wielded sophisticated internet news/media/email products to facilitate the spreading of defamatory communications about Plaintiff to millions of people.  By reason of the per se defamation engaged against Plaintiff by Defendants, Plaintiff has been forced to suffer impairment of his good name, public embarrassment, humiliation, impairment to his professional reputation, public impairment of his abilities and integrity, anxiety, public ridicule, loss of past and future employment, mental pain and anguish, and additional damages.  A third-party affidavit documenting the defamation is attached **Exhibit 37**.

### *AMENDMENTS TO ORIGINAL COMPLAINT*

39.  Plaintiff is not a voluntary Pro Se litigant, and he has requested the Court provide him an attorney without response.  This litigation relies upon well-founded legal principles that should make it easy for any Pro Se litigant to pursue despite the involvement of new technologies that the Court may not be entirely familiar with.  Much of the technology that is relevant to this complaint is relatively new technology, becoming popular in approximately the past 5 years.  This litigation can be made easy or hard to pursue depending upon how the technological aspects are tempered by the evidentiary standards to be applied by the Court.

40.  Rules of evidence require a bare showing that something is what it purports to be.  Can Plaintiff simply print something off the internet and submit it to a jury as valid evidence that can be introduced at trial?  If the Defendants are claiming that they never posted the defamation, is the Court going to credit that testimony in any way, and how?  What will the Court require of either the Plaintiff or Defendants if the Defendants attempt to deny the communications which Plaintiff has submitted into evidence?  If the ISPs continue to refuse to provide the evidence they have collected concerning the identities of the Defendants, is the Court going to continue to protect them from sanctions or further litigation?  Plaintiff has valid questions which he has been asking the Court since 2012, without any answer thus far.  Plaintiff would rather dispense with the nonsense by questioning the Defendants directly in discovery/trial to properly understand why they won't stop stalking Plaintiff, but the Defendants have refused to participate in any Court process thus far and have instead demanded that they be legally allowed to stalk Plaintiff.

41.  In a Pro Se case, it is already assumed that the Courts would construe evidence submission standards at a much less stringent technical standard than litigation between wealthy

technology companies with teams of attorneys, but this still does not guarantee that Plaintiff can properly mitigate all the legal loopholes which the Defendants would attempt to manipulate in their efforts to attain legal justification for their unlawful actions.  Optimally, Plaintiff would always aspire to present evidence to the Court that is verifiable by a third party.  It is therefore necessary to explore some of the technical aspects of this litigation to ensure the District Court is familiar with advanced internet technologies which are the subject of this Complaint.

42.  A central facet of this litigation concerns defamatory books, messages, internet postings and slanderous direct face-to-face interviews engaged by a group of John Doe Defendants who are using advanced internet technology provided by Google/Amazon/Yahoo to spread the stalking far and wide, such stalking/defamation causing Plaintiff substantial harm. John Does are posting libelous material on the internet about Plaintiff, and once Plaintiff discovers it and contacts them to pull it down, they delete it and the repost allegations at numerous different sites, all the while claiming that Plaintiff and his army of 'hackers' have infiltrated all these internet accounts to posted it themselves.  When the Defendants become aware that their defamation is being monitored by Plaintiff, they continuously switch to different websites to attempt to evade monitoring because their intention is to continuously gain an audience of followers that they can 'activate' with false allegations against Plaintiff in an effort to incite physical harm against him.  It is therefore implied that the John Does are intending to utilize these technologies against Plaintiff in an illegal manner and for an indefinite amount of time, until/unless they can finally be neutralized.

43.  Defendants attempt to claim that 'hacking' activity is untraceable and undetectable. This is completely false as hackers can always be detected by various methods.  The easiest way

21

for Plaintiff to dispute any claims of hacking by the Defendants is to simply provide the Court an affidavit that he did not post the materials himself. The burden should always be upon the alleged internet account holder to provide the evidence that he did not make the postings if hacking is claimed as a defense. When Plaintiff raised these issues in the 12-1322-RGA case, the Court never addressed them. Plaintiff thereby attempted to ensure that the Court was cognizant about the implications of its decision to overlook these technical factors by trying to subpoena the ISPs, as it is easiest to dispute a hacking claim by simply querying the ISP for IP/MAC address logs documenting the identity of the account/digital device being used to physically transmit the postings to the ISP for publication. After reviewing these IP/MAC address logs, it is assumed that the logs will certainly stand as indisputable third-party evidence to additionally validate that Plaintiff did not make the postings, and that the Defendants posted the defamation themselves. Once the IP/MAC address logs are provided to the Court proving that the posts were being made from a specific IP/MAC address linked to the Defendants, this automatically neutralizes the claims being made by the Defendants.

44. If the IP logs provided by the ISPs confirm that the posts were made from the Defendants' computers, and the John Does additionally attempt to claim that a hacker remotely accessed their computer to use it for purposes of posting the defamatory material to the ISPs (in an effort to frame the Defendants' computers as the source of the postings), then a computer forensic expert can still analyze the TCP/IP stream of communications taking place between the Defendants' computers and their main service provider during times when the postings were being made from that computer. The actual internet traffic contained in packets travelling over the TCP/IP streams would absolutely detect a remote connection being established from a

22

hacker's computer to the Defendants computer for purposes of remotely controlling their computer to post the defamation.  So in all instances of a hacker attempting to manipulate forensic computer evidence to frame an unsuspecting person with criminal allegations, there would still be numerous definitive and undisputable methods available to ISPs, law enforcement officials and private forensic investigators by which to detect and trace any such technical manipulations to their original source.  For that reason, technical evidence can easily diffuse all these types of claims, and the Court should allow Plaintiff to acquire evidence in timely fashion.

### *TECHNOLOGY AND THE LAW*

45.  Plaintiff asserts that there exists numerous third-party evidence repositories that can completely refute any attempt by a person to fraudulently post defamatory material on the internet using other people's accounts in an attempt to frame them, and the best of these repositories is the Federal government.  The revelations by NSA leaker Edward Snowden (which are just the tip of the iceberg), and other information that Plaintiff acquired (which is still not public) confirms that the US/British/Israeli/French governments collaborate on a sophisticated digital data collection program that pretty much snapshots all communications traffic on earth on a daily basis and archives it for reference in a vast 'evidence pot.'  By archiving all streams of traffic on the communications grid, the governments can reverse engineer any form of communication and digital code to determine its origin and positioning within the grid, in relation to all other communications/application traffic.  By cross-referencing relational communications/applications, the governments can thereby trace 100% of all hacking attempts to their original sources with 100% accuracy.  Even the Tor Project (a popular anonymity protocol) is completely useless against top-level government surveillance.

23

46. Plaintiff's original field of study is mathematics and he has a special expertise in advanced number theory. Through the course of Plaintiff's mathematical studies he has confirmed that all encryption technology (on which internet security/anonymity is premised) is automatically susceptible to infiltration due to a fatal flaw in cryptographic techniques which is exposed by Plaintiff's solution to the P v NP problem, a number theory dilemma found at: http://www.claymath.org/millennium/P_vs_NP/dilemna

47. Plaintiff's solution to the P v NP problem is verified by the existence of the original 'BBP formula,' which is the first known formula to quantify the manner in which Pi is encoded into a tri-polar elliptical dimension. In cross referencing the properties of the BBP class of formulas against the backdrop of Ramanujan's Pi Convergence formula (which also has unique properties of quadratic sampling), Plaintiff was able to cobble together a synthesis of the special properties of both Pi and Phi to express a solution to the P v NP problem (P=NP). Plaintiff credits Richard Kay for spurning his interest in the topic after describing the problem to Plaintiff in a manner by which he could easily understand it. Kay's website can be found at: http://web.mat.bham.ac.uk/R.W.Kaye/minesw/.

48. The solution to the P v NP problem also confirms a solution to the General Relativity v Quantum Mechanics dilemma observed by Einstein. It also confirms critical facets of string theory architecture, and it also disproves Einstein interpretation of a cosmic 'speed limit.' This mathematical construction also confirms that objects can 'travel' faster than the speed of light, but not 'backwards' in time (thereby resolving Einstein's misunderstanding concerning the properties of time). It also confirms that universal components existed <u>prior</u> to the Big Bang that created our dominant tri-polar dimension, and these components also existed in a state of

'segregation' prior to the convergence event memorialized by the Big Bang.  Prior to the Big

Bang, the universe existed as at least three distinct separate entities.  Two of the entities were

'static' (matter and antimatter) and one entity was non-static (time).  A reaction occurred

between these three components that caused the Big Bang (the conception of our universal tri-

polar dimension).  The force of this reaction also manifested an oscillation between 'contraction'

and 'expansion' of our dominant tri-polar universal dimension, such oscillation occurring in

parallel throughout all the dimensions (including those existing outside of our dominant tri-polar

dimension).  In a Schrödinger's cat-like reconstruction, matter which resides within the event

horizon of a black hole experiences the contracting 'side' of the universe, while matter that exists

outside of the event horizon of a black hole ends up experiencing the expanding 'side' of the

universe.  Time also has a specific 'direction' as it spirals through a multidimensional elliptical

medium that spans at least 7 dimensions of oscillation (at least four of which reside outside of

the 3 dimensions that comprise our tri-polar universal container).  Traditional string theory

predicts 11 dimensions that contain the oscillation, thereby predicting four dimensions residing

on opposite sides (in parallel) of the tri-polar structure which makes up our observable universe.

These discoveries by Plaintiff in the field of number theory are also central to Plaintiff's dispute

with Federal Authorities concerning their actions in the 11-23492-MGC suit, filed in parallel to

this Delaware litigation.

49.  Why is Math and Physics relevant to a Defamation case which is unlawfully being

influenced by 'gay rights'?  It is actually a central facet of Plaintiff's religious dispute with the

general concept of homosexuality as applied to humans.   If you view the model of how our

universe was created as the model of all creation, there are clear implications concerning the

concept of homosexuality which are inherent in the model of our universe.  If one were to take the Grand Unified Theorem and label 'matter' as masculine, and 'anti-matter' as feminine (or vice versa), we can view the universe as and interplay between masculine and feminine forces which end up either 'dominant' or 'recessive' based on their position within the system.  In our current state of flux in the universe, we view 'matter' as dominant because it is abundant in our immediate sphere, and 'anti-matter' as recessive because it is rare (despite the fact that equal amounts of both populate our universe).  As a result of this fact, it is predicted that there can be different types of experiments conducted which can have dramatic impact upon technological advancement of humanity.  For example, it is relatively easy to obtain vast amounts of energy from interactions between matter and antimatter, but there is only one specific way this should be attempted even though three possible ways exist.  One way is to perform a 'heterosexual' reaction (fusion-oriented) to attempt to 'produce' this energy.  Another way is to attempt a 'homosexual' reaction (fission-oriented) to attempt to 'release' this energy.  The third is to attempt a 'charm' reaction, whose outcome is still undefined (and therefore the next stage of understanding how our universe actually ends).  For each reaction, there is also an anti-reaction which operates under similar principles.

 50.  The Grand Unified Theorem ("GUT") does not completely predict what the consequences will be of applying various permutations of fusion/fission/charm reactions to the matter/antimatter framework that permeates our tri-polar universal container.  GUT only confirms that one of the reactions will produce vastly more efficient sources of energy, one of them is still 'undefined,' and one of them will trigger a black hole that will instantaneously destroy our entire solar system.  So the matter of homosexuality as a scientific theory is central to

26

particle physics in terms of the dynamics of the relationship between matter and anti-matter, especially if we were to look at the properties of our dominant tri-polar universe as being conceived through a type of 'sexual union' represented by what the physicists have come to call the Big Bang.

51.  So if homosexuality as a concept is expanded to particle physics, if one were to assume that the universe was created in a Big Bang reaction between matter and matter, then you would be advocating for a 'mathematically homosexual' version of the Grand Unified Theorem to explain the origin of the universe.  If one were to assume that the universe was created in a reaction between matter and antimatter, then you would be advocating for a 'mathematically heterosexual' version of the Grand Unified Theorem to explain the origin of the universe.

52.  So a 'mathematically homosexual' big bang predicts that only matter existed prior to the universal creation, and that the big bang somehow caused matter to react with itself and create both the universal space-time continuum and anti-matter through the same reaction.  This is not possible because additional energy would be necessary to 'convert' matter into antimatter for this model to work, and if the energy is already expended to 'create' the universe then additional 'conversion' energy cannot be predicted by the GUT to support any such assumption that the universe could have been created via a 'mathematically homosexual' Big Bang.

53.  The problem with this general theory concerning homosexuality and its implications in the field of physics, primarily relates to top-secret experiments which if attempted, can destroy our entire solar system.  Certain types of experiments which attempt to test the origins (and endings) of our universe can inadvertently trigger undesired consequences if done incorrectly. There are at least three types of experiments which can be conducted to test the validity of the

27

GUT.  One experiment concerns a safe 'mathematically heterosexual' expression of the Big Bang, which has already yielded confirmation of a method by which to derive cheap energy (although still secret because it can be weaponized).  Another potentially dangerous experiment may not actually destroy our solar system, but it is predicted to somehow 'suspend' time in a way that we cannot predict.  The third experiment is a 'mathematically homosexual' experiment which claims an ability to 'reverse time,' but since time cannot be reversed and there is no possibility that a homogeneous big bang could produce a heterogeneous universe, Plaintiff contends that the effects of attempting this type of 'mathematically homosexual' reconstruction of Big Bang, will be to create a man-made black hole that will immediately react with our Sun and cause an instantaneous destruction of our entire solar system.  Moral of the story:  Gay sex between humans may not destroy the world, but there are certain types of ways to provoke 'gay sex' between the elements that created our universe, and none of them should ever be attempted because the result is certain destruction.  This is why high-level technology should never remain secret for extended periods of time, because the ability of one country to inadvertently destroy the remainder of the Earth by attempting crazy experiments is assured.

54.  Much is said in these blogs describing Plaintiff as 'homophobic' and other defamatory allegations, but nothing can be further from the truth.  Plaintiff could not care less if two homosexuals wanted to 'marry' each other because Plaintiff does not desire to acquire information about what other people chose to do in the privacy of their bedrooms.  It is fair to assume that a gay marriage between humans is not going to destroy our entire solar system, but that does not require anyone to automatically endorse it as productive to our understanding of the universe.  Plaintiff is simply against any scientific agency that would consider attempting to

28

engage a 'mathematically-homosexual' black-hole experiment, because such an experiment will not 'reverse time' as many homosexually-oriented mathematicians suggest, but rather it will destroy the space-time fabric in our immediate solar system.  The United States government has already derived near-unlimited energy from the 'mathematically heterosexual' reaction derived from the GUT model, thereby confirming the validity of the GUT without the need for any further experimentation.  Plaintiff is against any further experimentation in this field by any government without international consensus.  Plaintiff is also in dispute with the US government because he feels it is appropriate for the entire international community to be involved with making decisions about these emerging technologies, in order to ensure that all input from everyone is always received so that the technology can continue to be implemented safely and without unnecessary risks to the entire humanity.  There is no need to 'over-experiment' with attempting to 'reverse time,' simply because certain minority factions of scientists wish to try and forcibly extend the sociological implications of this mathematical model into an endorsement of homosexuality by attempting to validate portions of it through advanced scientific experiments that only risk destroying our entire solar system.

55.  The implications of this mathematical model of our universe are already in use by the United States government, so Plaintiff was not the first to discover this phenomena.  Plaintiff was simply able to observe that the United States government is already aware of the flaws inherent in all encryption schemes by discovering a solution to P v NP which he was able to utilize to discover the rest of the secrets being kept by our government.  If these technologies are made public, the United States government fears that their surveillance methodologies will quickly be restricted by foreign governments that will develop more secure methods to prevent

invasion of privacy.  In the interim, it is a fact that the United States government has obtained

advanced technology that can easily archive all digital data in the entire planet on a daily basis.

They are currently using technology and storage systems far more advanced than the very ISPs

who are defendants in this case.  So even if the Courts, Defendants and low-level law

enforcement refuse to provide this evidence concerning these transmissions, it is still a fact that

records of these transmissions exist, time immemorial.

*NON-DIGITAL COMMUNICATIONS*

56.  The US government and their allies also engage 24/7 video recording (3-

dimensional, all wavelengths) of the Earth's surface using satellites with video resolution so

powerful that you could view the scratches on a quarter (in super slow motion) as it flips through

the air following a coin toss.  The US government can always reference these recordings and

determine the truth of any criminal matter, such as who was chasing who when George

Zimmerman killed Trayvon Martin in Florida.  This vast archiving system is designated to

investigate potential terrorist/high-technology threats by giving law enforcement the ability to

'go back in time' (in the only way possible) and review the recordings of crime scenes and other

digital evidence to determine the truth of any particular event.

57.  Due to the fact that there are very few people with above top-secret clearance

available to engage highly-sensitive law enforcement operations on a global scale using this

technology, this entire system (which the US Government calls KRONOS) it is kept entirely 'off

the grid' so as to ensure the most serious crimes (such as WMD terrorism), cannot be attempted

by fringe terrorist organizations who may happen to obtain access to WMDs through infiltration

of foreign or domestic government agencies.  In the event that any terrorist organization should

attempt a WMD terrorism plot (or any government/individual should discover the Grand Unified Theorem and attempt to weaponize it), these archiving systems are still able to trace the evidence trail to the actual source of any threat, especially in the event that one government (or religion) is attempting to frame another government (or religion) with false-flag terrorism.  For this reason the United States government prefers not to admit that it is in possession of extremely advanced technology so that it can continue to maintain an edge over global competitors.

*IMPLICATIONS OF ADVANCED TECNOLOGY*

58.  The existence of advanced technology ensures that every single bit and byte that floats over the vast global communications grid is being archived, including rogue signals sent out on every spectrum of the airwaves.  Even if someone was using carrier pigeons to communicate, there would be satellite footage of the pigeons being dispatched and received by the terrorists somewhere in the vast 'evidence pot' available to investigators if they are smart enough to locate it within the exabytes of data available.  Plaintiff cannot possibly hack any person on this earth without the United States military knowing about it (especially concerning an investigation as serious as this one).  For the Defendants to claim that Plaintiff is so advanced that he could develop a new hacking method which is undetectable to the ISPs, Defendants and the Federal Government (including the FBI, CIA, NSA, DOD, DARPA, KRONOS) is a joke.

59.  Regardless of the fact that the Federal government clearly has access to technology to trace any communication or hacking (no matter how simple or advanced) to its direct source, Plaintiff is still relegated to attempting to establish his innocence through a procedure that does not involve requesting access to government evidence databases, as it is assumed that the Federal government would not provide it anyway for fear of making public disclosures of its own

sources and methods.  For that reason the ISPs have become important in this matter because they too have an obligation to protect the public from people who would use their products in an illegal way, and part of that protection is providing litigants the same access to its records that it provides to State/Federal officials, especially when wrongdoing has been established.

60.  Plaintiff must also first confirm that the ISPs are refusing to provide him the information concerning the identity of the account holders (assuming they are not Google employees) before again attempting to serve a subpoena on the FBI for records concerning their investigation (or lack thereof) of the threats which Plaintiff has been receiving from these Defendants for years.

61.  The combination of the IP logs provided by the ISPs from their own internal network indicating that a communication came from a specific computer linked to the Defendants, and the lack of any evidence in the TCP/IP stream that remote control of the computer was occurring at the exact time the postings were being made, easily and quickly eliminates long-distance hacking as a potential factor in the publication of defamation to an ISP (and this is without ever needing to subpoena the FBI).  Once the evidence (or lack thereof) proves that no manner of long-distance hacking was possible in order for the defamation to the posted to the ISPs from the Defendants' computers directly, then the Defendants can only claim that Plaintiff physically broke into their homes to access their computers directly in order to make the postings.

62.  It is also assumed by Plaintiff that the Court should absolutely place the burden of evidence upon the Defendants to prove that they were hacked since they are the ones making these claims, but all previous attempts by Plaintiff to have the Court clarify this matter have failed.  As a result Plaintiff has pursued the ISPs directly because they are completely capable of

providing undisputable evidence concerning the identities of the John Doe Defendants which are posting the defamation (assuming they are not employees of the ISP), including IP/MAC address logs which will clearly dispute any allegation by the John Does that the defamation was posted by hackers or anyone else related to the ISPs directly.

63.   The nature of the Defense being attempted by the John Does in this case raise an interesting question.  Are there legal loopholes in the laws as they relate to internet stalking/harassment/defamation which could allow an individual to terrorize or otherwise incite/solicit violence against some unsuspecting victim using the internet, and without fear of legal repercussions?  The answer is no, and the course of actions undertaken by the Defendants in this case are illegal by both State and Federal law.  There is no brilliant legal invention in the actions of the Defendants, only unlawful acts cobbled together under the banner of 'gay rights' when a heterosexual would immediately be arrested for attempting just a fraction of the actions undertaken by Defendants.

_HISTORY OF THE CONFLICT_

64.   The suspected group of John Does have been stalking Plaintiff since 1987 when he was a 12 year old student at the American School of Tangier.  During that time, Plaintiff reported to law enforcement authorities an attempted molestation incident at the hands of the Headmaster of AST, an individual named Joseph McPhillips.  When Plaintiff reported McPhillips to the Moroccan and American authorities in Tangier in 1987, they immediately acted to suppress this criminal complaint involving very serious allegations, and this unlawful suppression thereby emboldened Joseph McPhillips and his supporters to conduct a prolonged stalking/harassment campaign against Plaintiff.  Plaintiff thereby assassinated Joseph McPhillips in 2007 to end his

33

reign of terror against Plaintiff and others, and Plaintiff was subsequently rewarded by the Moroccan government for the successful assassination of McPhillips by being given a job at the same institution where McPhillips attempted to molest the Plaintiff.

65.  After Plaintiff accepted a job at AST in 2007, Plaintiff caught another homosexual Headmaster of that same institution (an individual named Mark S. Simpson) in possession of child pornography approximately 2008-2009, and also discovered that Mark Simpson and others were involved in a plot to spread HIV in Morocco.  When Plaintiff reported Mark Simpson and his associates to the Moroccan and American authorities in Marrakesh, Morocco, they again acted to suppress the complaint and thereby launched a smear/threat campaign against Plaintiff and others in an effort to once again suppress the prosecution of the Defendants, who are represented by a 'powerful' group of politically-connected homosexuals from the Hollywood community.

*FIGHT OR FLIGHT*

66.  When Plaintiff first encountered these Defendants in 1987 and reported them (only to have it suppressed by government officials), Plaintiff's father thereby left Morocco out of protest because the police did not arrest McPhillips when the incident was reported.  The local jurisdiction was Morocco and Plaintiff's father believed that the Moroccans should have instituted a Court process upon filing of the complaint, even if the US government officials were also attempting to deter the Moroccan authorities from pursuing the case.  As a result of these events, Plaintiff's family thereby fled Morocco rather than attempt a legal battle against the Moroccan government, and Plaintiff eventually ended up back at his hometown of Corona Queens, NY.

34

67.  In the years immediately following the incident, Plaintiff started getting threatening phone calls at his home in Queens.  The calls were clearly coming from individuals linked to Joseph McPhillips in Morocco who were still angry and vindictive against Plaintiff for his reporting of the attempted molestation.  It was also clear that they were also attempting to deter Plaintiff from any further attempts to report that incident to anyone else.  At first, the unidentified caller would try to lure Plaintiff into a conversation, and when Plaintiff would engage with him to try and determine the exact identity of the caller, this deranged individual would start to recount violent homosexual threats against the Plaintiff.  Plaintiff never reported the threatening calls to his family because he feared that if his father again attempt to again report McPhillips to American authorities in the United States, they would still refuse to arrest him and instead act to continue protecting him.  Plaintiff also knew that if he reported McPhillips to US authorities and they refused to act, that there would be no place left to flee out of protest at that point.  At this time, Plaintiff was only 12 years old and not able to defend against this much older group of violent adults, so when Plaintiff returned to America to discover that the stalking/threats from McPhillips would continue, he became resigned to accept that neither flight nor fight were available options at the time and Plaintiff simply had to endure the harassment and threats for years after leaving Morocco.

68.  Several years after return from Morocco to America, Plaintiff was eventually recruited into a law enforcement program with the DEA where he was essentially dispatched by them to spy on drug dealers in his local neighborhood.  This caused Plaintiff to spend approximately 5 years between 1991 and 1996 working 'undercover' investigating the mafia for his law enforcement associates at the DEA, only to be disavowed by them after Plaintiff

discovered the DEA's own criminal participation with various criminal offenses following his arrest in a DEA sting operation in 1996.

69.   After this botched DEA drug sting operation from 1996 that resulted in the death of a murder suspect in May of 1997, Plaintiff was thereby subjected to a series of terrorism sting operations by overzealous federal authorities who became committed to attempting to entrap Plaintiff into additional false criminal cases as a means by which to exert control over the developing scandal.  It was considered scandalous to the DEA that Plaintiff (at 15 years old) could successfully infiltrated vast criminal organizations that even their best federal agents were incapable of infiltrating, so they sought to punish Plaintiff for being a better investigator than their most experienced agents by refusing to allow him the opportunity to provide them with the information he discovered during his investigations (which included information on numerous unsolved homicides).  These various attempted sting operations culminated in the 911 attacks whereby Plaintiff directly witnessed the Federal government's prior knowledge of the impending 911 plot due to his infiltration of the Pakistani government's heroin distribution operations in New York.  Plaintiff thereby spent the remaining 12 years since the September 11th, 2001 terrorist attacks evading numerous additional attempted law enforcement stings whereby they spared no effort to try and draw Plaintiff into involvement with serious criminal and terrorism-related activity as an illegal means by which to expose him to a false/fabricated/manufactured criminal indictment as an attempt to exert illegal control upon him.  All these events are documented in case no 11-23492-MGC (Southern District Florida) and the Delaware litigation, and now additional litigation in New York.

36

70.   While the Federal government was itself attempting numerous plots to try and draw Plaintiff into involvement with terrorism, Plaintiff was also under constant threat from the John Does identified in this Complaint who continued to stalk Plaintiff as a type of homosexual rage against him for his refusal to submit/accept to the sexual advances of Joseph McPhillips. Because there is now a very prominent homosexual movement inside US law enforcement, it is also assumed by Plaintiff that the unlawful actions of Federal Agents which originally resulted from his involvement in the DEA Explorer program, has expanded and metastasized to include additional groups of federal agents that seem have formed irrational anger against Plaintiff for his refusal to renounce his religious beliefs and endorse homosexuality as the greatest thing since sliced bread.  Plaintiff views Joseph McPhillips pedophilic advance upon Plaintiff and others as nothing less than a clear psychosomatic sexual disorder/disability.  Plaintiff never even had a conversation with the man until the events of that day when he called Plaintiff into his office to congratulate him on his grades, and then attempt to molest Plaintiff in what was a drunken stupor.  Plaintiff will never accept that Joseph McPhillips rage against Plaintiff for his reporting him could ever be justified in any way.

71.   Even after the advent of the Federal government's interference in Plaintiffs childhood (which evolved into what Plaintiff believes was an attempt by them to frame him with involvement with the 911 attacks), the stalking of Plaintiff by homosexuals still continued unabated and in full view of Federal authorities who were now illegally monitoring Plaintiff after 911 in an effort to deter him from reporting the events he witnessed leading up to, and after, the 911 attacks.  From 2001 to 2003 the John Does were sending Plaintiff various death threats ranging from telephone calls, messages left on his car to actual emails sent to his email accounts.

Plaintiff met with Special Agent Perry Cuocci of the FBI in summer of 2003 to report these threats, including email threats being sent to Plaintiff's personal email address, yet Special Agent Cuocci took the report and never investigated.  As a result of the FBI's refusal to investigate these threats against Plaintiff in the summer of 2003, Plaintiff thereby took matters into his own hands and used his own proprietary methods to attempt to discover the actual identity of the stalkers.

72.  By approximately 2003, the suspected John Does reverted to email threats being sent to Plaintiff's personal email address, and this was the first identified attempt to use emails.  Once the threats started to arrive digitally, Plaintiff was thereby rendered able to trace them for the first time since 1987.  Plaintiff was certain, even before tracing the emails, that whoever was sending them was likely a sexually-deranged sympathizer of McPhillips.  Although the types of threats that Plaintiff started to receive since returning to America from Morocco varied, there was always a consistent sexual theme prevalent in all communications received from these 'anonymous' stalkers.  For example, when Plaintiff started dating girls after his return to America, the 'anonymous' stalkers would always seem to learn about Plaintiff's personal relationships and would attempt to interfere with them.

73.  This harassing interference took on an alarming turn shortly after Plaintiff began having a relationship with an Assistant Principal of a South Bronx High School.  In this stalking episode from sexually-deranged McPhillips sympathizers which took place from 2001 to 2003, Plaintiff was receiving threatening anonymous communications claiming that his girlfriend was infected with HIV.  Plaintiff brought these communications to the attention of his girlfriend during the time to try and discern if they were coming from individuals affiliated with Joseph

38

McPhillips, or her own friends in the New York Board of Education, and she denied that any of her friends could be the source of the communications despite the fact that she had numerous gay friends whom Plaintiff suspected of involvement with the stalking.

74. When Plaintiff started receiving unsolicited emails from the stalkers approximately 2003, the FBI refused to investigate the threats thereby prompting Plaintiff to manufactured a custom application that he used to infect the computer which was sending him the communications in an effort to discover the identity of the author. Plaintiff did this in full view of the FBI who were illegally monitoring Plaintiff's communications due to his threats against them for refusing to investigate the stalking (which they clearly were aware of the source and were refusing to inform Plaintiff). As a result of Plaintiff's own personal investigation, Plaintiff discovered that the emails were not being sent by the John Does in Morocco directly, but that these threats were now being sent by a relative of his girlfriend's best friend. Although there was no direct link in that specific matter between McPhillips and the stalker, it was still relevant that Plaintiff discovered (through his surveillance) that the stalker was secretly a bi-sexual. Although Plaintiff only met this person twice, this individual thereby orchestrated a very serious stalking campaign against Plaintiff and his girlfriend for several years up until approximately 2004. The entire time, the Plaintiff never knew that this individual had bi-sexual proclivities as he presented himself as a married man with children.

75. When Plaintiff analyzed the internet activity of this stalker who he caught in 2003, he discovered that this individual was directly searching out homosexual pornography. A sample log file from this stalker's computer is attached as Exhibit 42, where you can see in the log that the offender is searching out the term 'tranny' while surfing through porn. There are dozens of

additional logs where this person is directly searching out homosexual pornography by actually

typing in homosexual search phrases himself (as opposed to accidentally clicking a link to

homosexual pornographic content).  This event also confirms that every single time Plaintiff

discovers the identity of someone who is stalking him anonymously, it turns out to be a bi-sexual

or homosexual 100% of the time.  Plaintiff is stalked exclusively by bi-sexuals or homosexuals,

as Plaintiff has never once experienced stalking from a heterosexual in his entire life (except for

being placed under unlawful surveillance by police due to the people he has associated with).

76.  Additionally, if the Court reviews the email Plaintiff received on April 20th, 2013,

(attached as Exhibit 41) you will see the authors of this death threat email reference that Plaintiff

is on a homosexual 'hit list.'  As a result of this, Plaintiff believes that he was placed on some

sort of master hit-list by Joseph McPhillips as early as 1987, whereby all bi-sexuals and

homosexuals are somehow able to collaborate with each other on operations intended to harm the

Plaintiff and others who may also be placed on this master list.  Even when Plaintiff cannot

discover any observable link between a particular 'anonymous' stalker and Joseph McPhillips

(aside from the anonymous threats always being sexual in nature), the commonality between all

his stalkers have been that they are either bi-sexual or homosexual.  As a result of this, the claims

in the April 20th threat email to Plaintiff claiming that Plaintiff is on a gay terrorist 'hit list' are

believed to be completely accurate, and Plaintiff believes that he was placed on this list in 1987

immediately upon reporting McPhillips to authorities.

77.  So the stalkers recruited by the John Does from Morocco have expanded to include

pretty much anyone that is bi-sexual, homosexual or sexually deviant, and who should find

themselves in proximity to Plaintiff to be able to illegally spy on Plaintiff or otherwise

stalk/threaten him.  Plaintiff therefore became the sole obsession of this group of Hollywood-affiliated homosexual pedophiles who took up Morocco as their base of operation.

78.   After Plaintiff discovered the identity of the stalker in 2003 and confirmed that he fit the profile of his stalkers after discovering that Plaintiff's stalker was a bisexual, Plaintiff thereby left New York and moved to Florida in 2004 to attempt to try and escape the John Does without having to resort to violence to defend against these very provocative acts.  Plaintiff quickly learned that he could never escape the very determined John Does.  Shortly after arriving in Florida, again Plaintiff quickly found himself being stalked by a neighbor named Marjorie E. Malone, who Plaintiff discovered to be working from her home as a telephone sex operator.  The fact that this person was involved in the sex-trade is again keeping consistent with the theme that every time Plaintiff finds himself being stalked, it is usually someone who is obsessed with sex in some clearly dysfunctional way.

79.   After approximately a year of Plaintiff being stalked by this telephone-sex operator who was Plaintiff's neighbor at the time, this neighbor eventually expanded her telephone operation to start calling Federal Authorities and accusing Plaintiff of involvement with terrorism (based upon nothing more than the fact that he was of Moroccan descent and had New York license plates on his car) in an effort to provoke harassment of Plaintiff by federal authorities. Federal Agents thereby received a false complaint from Plaintiff's neighbor (which they knew was false) in September of 2004, that they later attempted to use an excuse to visit Plaintiff's job and cause a scene in December of 2004, in what appears to be an attempt to punish Plaintiff for divulging confidential information to Michael Tiger (a terrorism attorney) who contacted

Plaintiff a month prior in October of 2004 to ask him to testify in a terrorism case which was

ongoing in New York at that time.

80. Shortly thereafter, the Florida neighbor was so emboldened by not being arrested for

her false terrorism report, this crazed neighbor eventually filed another false police report in

February of 2005 accusing Plaintiff of breaking into her house and attacking her in her home.

She did this as part of an effort to manufacture a civil suit attempting to obtain money from the

insurance carrier for the condominium complex where Plaintiff resided. Plaintiff was thereby

arrested and suffered substantial permanent injury to his face as a result of his incarceration in

that case, as Plaintiff was kidnapped off the street and held incommunicado for 2 weeks in what

appeared to be an attempt by Federal Authorities to make Plaintiff believe he was arrested after

being framed in a terrorist attack rather than some false claim by a neighbor (which they only

charged as a misdemeanor because they knew it was false, despite the neighbor describing

crimes which would have been a very serious felony). Plaintiff is still permanently disfigured as

a result of the injury he sustained during this Federal experiment conducted against him in 2005-

2006. Plaintiff's family eventually located Plaintiff in prison after he disappeared for two weeks

and bailed him out. Only after Plaintiff was finally released did he find out that he was not

arrested for terrorism charges, but arrested and held incommunicado for two weeks (for a

misdemeanor offense) based upon yet another false police complaint filed by this neighbor.

81. Plaintiff went to trial in October of 2006 and was acquitted of all the false charges, at

which point he left to Morocco to try and end the stalking at its source. After arriving in

Morocco, Plaintiff thereby assassinated Joseph McPhillips with the assistance of two Moroccan

security officials, and with the CIA having been previously informed the operation was

imminent.  In the year following the assassination and up until he met a suspected John Doe in this case (Mark Simpson), Plaintiff was living the most peaceful existence of his entire tumultuous life since 1987.  For the first and last time in his life, Plaintiff believed that no possible threat could ever resurface from this pedophile mafia in Morocco ever again.  Plaintiff would soon be proven wrong as the resilience of their obsession was clearly unprecedented.

82.  After the assassination of McPhillips, the remainder of his associates which are now represented by the John Does listed as Defendants in this case, thereby regrouped and retaliated against Plaintiff a year later by recruiting additional coconspirators from New York who they imported into Morocco in an attempt to provoke a conflict between Plaintiff and the Royal Family (as some sort of last ditch effort to somehow assassinate the Plaintiff).  Shortly after Mark Simpson and these suspected John Does arrived in Morocco, they immediately attempted to manufacture scandals to entrap Plaintiff into a confrontation, and when that failed, they eventually resorted to publically accusing Plaintiff of the most serious crimes (including terrorism), and they thereby attempted to force the Moroccan government to arrest Plaintiff on false terrorism charges which included allegations that Plaintiff was plotting to blow up the school during graduation ceremonies.  When the attempts by the John Does to intimidate the Royal Family into pursuing a false criminal prosecution against Plaintiff in Morocco failed, the John Does thereby fled Morocco where they continued to target Plaintiff and his family.

83.  Shortly after the suspected John Does fled Morocco in 2009, Plaintiff was subjected to a renewed campaign of death threats from these John Does after a hiatus from these threats for over a year since the assassination of McPhillips.  This enhanced threats continued for the entire year of 2009 and 2010 and were very severe in nature, including incidents whereby the John

43

Does would throw large amounts of blood on Plaintiff's door at his home in Marrakesh and

Tangier (which Plaintiff believes to be a continuation of the HIV threats that they have been

making against Plaintiff since the stalking episode from 2001-2003).  Plaintiff was eventually

able to leave Morocco in January of 2010 (after finally being cleared of Simpson's criminal

complaints), and Plaintiff returned to American to file a lawsuit against the suspected John Does

in Delaware in a final attempt to neutralize this aggression, case no 10-431-RGA.

84.  The John Doe's coconspirators in Morocco thereby retaliated against Plaintiff's

lawsuit by causing Plaintiff's cousin in Marrakesh to be unlawfully detained in Morocco for

approximately six months.  Plaintiff was thereby forced into a settlement agreement with the

John Does in order to obtain the release of his cousin from prison, which he did.  The settlement

agreement was completed in 2011, and then quickly violated again by the suspected John Does

within a day of being signed.  As a result of the collapse of that settlement, a terrorist attack was

provoked by the John Does in Marrakesh, Morocco in April of 2011, in an effort to frame

Plaintiff for a terrorism offense due to the emerging dispute between various military factions in

Morocco linked to the conflict provoked by the John Does.

85.  Approximately 2012, another settlement was reached with the suspected John Does,

and again just a month after that new settlement, it was again violated by a continuously

shrinking faction of John Does (as by this time, they had already exposed their criminal

intentions to most of the individuals they previously recruited unwittingly into their plot).  This

shrinking faction of John Does has now relegated itself to the internet, and has thereby resorted

to establishing defamatory websites on the internet in an effort to incite violence against Plaintiff

and his family, to which they succeeded.  These desperate John Does are committing these

actions for purposes of again attempting to provoke conflict between the various government officials which have fallen into dispute because of the false accusations being spread by the suspected John Does since approximately 2008-2009.

86.  This new stalking/defamation campaign is thereby documented in this Complaint, which is filed as an emergency matter because the threatening activity has previously resulted (and is continuing to result) in actual physical harm being inflicted upon Plaintiff and others. The John Does in this matter have thereby took to the internet since August of 2012 with an internet campaign attempting to solicit violence against Plaintiff and his family.  Because the John Does (just like McPhillips) are politically connected, they have been able to continue to obstruct/frustrate Plaintiff's efforts to restrain them.  Starting in 1987 when Plaintiff's father was shunned by both Tangier Police and the US Consulate in Tangier after attempted to file a complaint against McPhillips, law enforcement have always acted to suppress any criminal complaint made by anyone against these specific group of homosexual activists, likely because many of them were involved with US government intelligence gathering operations in the Kingdom of Morocco, or are otherwise affiliated with high-level Hollywood dignitaries.

87.  Civil litigation has thereby become the last possible option for Plaintiff to try and neutralize these John Does, as threat of criminal prosecution has no effect on these individuals and violence also does not deter their activities.  Civil litigation is about to also fail in Plaintiffs attempts to restrain them, at which point Plaintiff knows that they are emboldened to continue their actions because they feel they have government endorsement for their activities (which Plaintiff has been completely unable to discount).  The John Does will never cease stalking Plaintiff unless law enforcement and/or the Courts intercede to restrain them.  Law enforcement

is unlawfully refusing to arrest them because any attempt to do so will also confirm that law enforcement also protected their activities for years.  Civil litigation is thereby initiated by Plaintiff in an attempt to identify and restrain the Defendants so that Plaintiff can be fully apprised of these threats and who is making them, including any government and/or corporate partners which these Defendants may be receiving assistance from to engage their activities.

### *Google, Amazon and Yahoo*

88.  After the collapse of the settlement from the 10-431-RGA case following the advent of these internet postings, Plaintiff originally filed suit against a suspected John Doe named Mark Simpson.  As part of this litigation, Plaintiff served two subpoenas upon ISPs to attempt to determine the identity of the John Does (Google/Amazon) after Simpson began to claim he never posted the materials.  Plaintiff also reported additional threatening emails he was receiving from Yahoo accounts to the FBI (which is why he did not bother to subpoena Yahoo directly because the Yahoo content was obviously evidence of clear criminal intentions on the part of the John Does, so Plaintiff expected immediate action on the part of the FBI).  Google was the only ISP to respond to Plaintiff's subpoena, and in its response it stated that it intended to refuse to comply with the subpoena anyway and attempt to quash it.  Amazon did not respond, and the FBI never responded to Plaintiff's complaints concerning the Yahoo emails so that Plaintiff could confirm the source of these threatening communications.

89.  Shortly after serving the subpoenas upon the ISP in the 12-1322-RGA case, the Court itself rejected the subpoenas after they were already served on the ISP, and the Court then sent a letter to the ISPs directing them not to respond to the subpoenas.  The 12-1322-RGA case was thereby dismissed without Plaintiff ever being allowed to determine the true identity of the

individuals who were making these threats against him.  As a result of the District Court quashing Plaintiff's subpoenas, the John Does became even more emboldened and continued sending death threats to Plaintiff.  Upon Plaintiff receiving a death threat from the John Does on April 7th, 2013 (as documented in Exhibit 41), Plaintiff thereby responded to the suspected John Does with a series of emails on April 16th, 2013, which he also cc'd to the FBI Agent that was claiming to be investigating these matters since February of 2013 (attached as Exhibit 43).  After Plaintiff responded to the email death threats by the Defendants, the John Does again responded to Plaintiff's April 16th, 2013 email with another death threat on April 20th, 2013 (attached in Exhibit 41) where they confirmed the fact that Plaintiff has been placed on a gay 'hit list' since 1987, thereby explaining the reason why he has been relentlessly and exclusively stalked by bi-sexual and homosexuals for 26 years thus far.

90.  Shortly after Plaintiff responded to the Defendants continued death threats, Plaintiff was contacted by a New York City Police Detective hired by Mark Simpson to perform special favors for his group.  After threatening Plaintiff's mother in an email Mark Simpson sent to Plaintiff on April 7th, 2013, Mark Simpson subsequently received Plaintiff's response to this death threat on April 16th and went to the New York City Police Department to report Plaintiff's death threat while failing to inform the Detective that just a week prior, Simpson had himself sent a death threat to Plaintiff (while they were already involved in direct litigation with each other in Delaware) in order to provoke Plaintiff's obvious response.  This Detective named Desmond Egan thereby contacted Plaintiff claiming to be investigating the email that Plaintiff sent to Simpson.  Upon the Detective contacting Plaintiff, Plaintiff informed the Detective that Simpson had sent an email death threat to Plaintiff just a week prior, which was the very event

47

that caused Plaintiff to respond to him directly with the very email that the Detective was now

investigating.  Upon informing Detective Egan of this fact, the Detective thereby informed

Plaintiff that he should file his own police report against the Defendants with him, and if Plaintiff

could present evidence concerning the threats he was receiving, that he would immediately act to

arrest Simpson.  Plaintiff thereby made arrangements to meet with the Detective the first chance

he was able to travel to New York, and Plaintiff clearly informed the Detective that he would

bring copies of the death threats he was receiving from Simpson, including the one on April 7th,

2013.  Plaintiff assumed that once the detective viewed the death threats, that he would

immediately arrest Mark Simpson as he promised to do.  Attached as Exhibit 44 are the email

exchange between Plaintiff and the Detective.

91.  The suspected John Does shut down their websites approximately May of 2013 after

filing the false police report with the NYPD.  Shortly after the case against Mark Simpson was

dismissed on August 28th, 2013 by the District Court, the John Does immediately reestablished a

new website at the URL www.novelsofmssimpson.com where they continued to defame Plaintiff

after again feeling emboldened by the dismissal.  Attached as Exhibit 45 are additional blog

entries from the new site containing additional defamatory content.  The John Does also

responded to Plaintiff's previous litigation by altering their choice of service providers.  Initially,

the John Does chose Google to host their blogs, but as a result of Plaintiff filing suit against

Google, they have now switched to a new hosting provider for this new blog, the San Francisco-

based Wordpress.  As a result of Plaintiff's failure to resolve these threats from the John Does

through all the civil litigation in Delaware, and cognizant that the Appeal would now take

another 6 months to a year while the John Does remained online continuing to defame, disparage

and incite violence against Plaintiff and his family, Plaintiff thereby attempted to move to
Maryland so that he could be closer to Delaware and New York as he attempted to continue to
resolve these matters through this new case.  Plaintiff thereby moved to Maryland in September
of 2013, and then immediately thereafter, he travelled to New York to file a police complaint
with Detective Egan against Mark Simpson in an effort to neutralize his continued threats while
the appeal was still pending.

92.  Upon Plaintiff meeting with Detective Egan on September 26th, 2013, he thereby
provided Detective Egan with copies of the death threats that Plaintiff received prior to his email
response to Simpson on April 16th, 2013.  Upon reviewing the evidence that Detective Egan
stated he needed to justify his ability to arrest Simpson, Detective Egan then committed an illegal
action against Plaintiff.  Detective Egan thereby claimed that he would not arrest Simpson for his
previous death threats to Plaintiff because they were 'retaliatory' (even though they predated
Plaintiffs response on April 16th), and he proceeded to arrest Plaintiff for harassment of Mark
Simpson.  This action defies all logic and completely discounts the entire three years of litigation
which has been occurring in Delaware, where Plaintiff constantly reported Simpson's unlawful
threatening activity to the Courts, to no avail.  Plaintiff also continuously reported Simpson's
activity to the FBI (and NYPD) since 2009, to no avail, and Plaintiff has been attempting to
report the overarching organization to which Simpson belongs since 1987, to no avail.

93.  Plaintiff assassinated Joseph McPhillips after he attempted to molest Plaintiff in 1987
and then subsequently stalked Plaintiff for 20 years until 2007.  In the instant case, the
stalking/threats/defamation from the resurrected Joseph McPhillips have been going on for 4
years thus far, and the activity has been fairly extreme in nature compared to the previous 20

49

years as the John Does were now filing false police complaint after false police complaint trying

to find some takers for their plot.  It also became clear to Plaintiff that Simpson was deliberately

attempting the most extreme provocations in an effort to provoke Plaintiff into violence, and this

indicates that Joseph McPhillip's supporters clearly discovered that Plaintiff assassinated

McPhillips and were attempting to retaliate against him by luring him into further violence

against Simpson as a means by which to attempt to finally entrap him into a criminal case that

they could somehow control.  Plaintiff long anticipate that the emergence of a conflict with

Simpson was part of this strategy, and for that reason Plaintiff never attempted to hack, threaten

or otherwise commit any illegal action against Simpson and instead committed to following

Court procedures to resolve the dispute.  Plaintiff was always against extra-judicial

assassinations, and only accepted to use this method on McPhillips after both the US

governments and Moroccan governments could not accept that McPhillips be punished for his

crimes via criminal prosecution because it would make his activities public.

94.  Despite all attempts by Plaintiff to use the Courts to neutralize Simpson, he admits

that he was incapable of overcoming the power and influence that McPhillips (and now

Simpson's) overarching organization in Hollywood has been able to wield upon the Courts.  In

four years since meeting Simpson, Plaintiff's first retaliatory email warning was just recently

sent to Simpson on April 16th, 2013.  Plaintiff never communicated with Simpson after he left

Morocco in 2009.  Plaintiff never hacked Simpson's accounts.  Despite all this, Plaintiff was

forced to endure the deranged ramblings of this Simpson who has filed numerous false police

reports against Plaintiff since 2009, none of which ever resulted in an actual arrest until Simpson

could finally secure the assistance of a New York City Police Detective willing to commit a

crime against Plaintiff in support of 'gay rights."  Plaintiff endured very severe threats in

Morocco, and even witnessed the complete destruction of his family in Morocco at the hands of

Moroccan government officials who were otherwise fearful of the exposure of this scandal.

Plaintiff continued to endure the threats even after the collapse of the first settlement which

provoked a terrorist attack in Marrakesh in April of 2011.  All the while, Plaintiff never once

sent a solitary email to Mark Simpson throughout this entire time period of these very serious

events which were ultimately provoked by him, and McPhillips before him.  Plaintiff could not

even locate Mark Simpson for service of process in the original 10-431-RGA case, as Simpson

completely disappeared without a trace immediately after fleeing Morocco, and he could only

rely on AST as a middle man to negotiate a settlement between the parties as Simpson only

communicated with his former co-conspirators at AST, begging them to be part of the settlement

while at the same time planning to violate it the second it was signed.

 95.  After the collapse of the second settlement in 2012, Plaintiff again travelled to Egypt

in February of 2012 and threatened the militants that he was planning to withdraw from

involvement with attempting to obtain legal assistance for one of their imprisoned leaders, a

terrorism Defendant named Sheikh Omar Abdel Rahman.  When Plaintiff informed them that he

was removing himself from the situation partially because it was becoming harder for him to

dedicate the time it required due to the legal burden which Simpson's actions were imposing

upon him, the unexpected response from the militants was to kidnap 7 innocent French citizens

to trade for Mark Simpson's extradition to the Middle East.  Upon discovery that this kidnapping

was conducted because of Simpson, Plaintiff immediately demanded that the militants agree to

release the hostages (which they agreed to do), and Plaintiff then travelled to the French

Embassy in Cairo on February 21st, 2013, to offer the return of the hostages (which thereby

caused a rumor to circulate that they were released, attached as Exhibit 46).  The French

government subsequently refused to accept the return of their hostages through the Plaintiff

(thereby confirming involvement with Simpson's operations), and they thereby allowed these

innocent hostages to remain in captivity for several months before paying 3.15 million to obtain

their release (attached as Exhibit 47).

96.  Even despite all these catastrophic consequences of Simpson's aggression against

Plaintiff, the FBI is still forcing Plaintiff to remain hostage to these numerous warring factions of

governments and intelligence agencies by refusing to speak to him about these matter directly

(while conducting decades of illegal surveillance the entire time), and the District Court has

refused to intervene to restrain and eliminate this obvious hazard and handicap of Plaintiff's

experience as a citizen.  Plaintiff only responded to Simpson directly after he received the death

threat email from Simpson on April 7th, 2013, because it was literally the final straw for Plaintiff

to discover that Mark Simpson had somehow recruited someone to monitor his mother in

Florida.  If the Court had acted to restrain these individuals in the original 12-1322-RGA

litigation, Simpson could not have attempted to file another false police report against Plaintiff

because he would be forced to explain his crimes in Delaware long before he could continue to

pursue them in New York via additional false police complaint where it is obvious that Simpson

(a former Principal of a prestigious Manhattan high school) and his boyfriend (a Manhattan

attorney) have friends in these Manhattan circles than they can solicit for a favor.

97.  To further complicate matters, it is completely unknown to Plaintiff what the strategy

of the Prosecutors could be in such a malicious prosecution which is now underway in New

York.  Plaintiff was assigned a Court Appointed public defender in the case, but he is non-responsive as of this pleading.  As a result of the arrest, Plaintiff thereby determined that it was quite possible that Defendant Simpson could try to claim that he never sent the email threat to Plaintiff on April 7th, 2013, and the New York Court could again refuse to allow Plaintiff to retrieve evidence from the ISPs that can help to confirm the identities of the persons making these threats (just as the Delaware Court is also refusing to do), and the FBI could also refuse to provide Plaintiff evidence proving that Simpson made the communications (just like they did in 2005 with the other stalker that filed a false police complaint against Plaintiff).  In this matter of the false police complaint in New York, numerous parties have access to evidence that would immediately exonerate Plaintiff, but all are refusing to provide it.

98.  Plaintiff had filed an emergency motion with this Court to ask the Court to issue Plaintiff an immediate summons to serve upon the ISPs so that they can be sure to preserve the evidence, and the Court refused to issue the summons stating that it needed more time to 'review' the instant Complaint, which the Court already has a familiarity with due to dismissing its identical twin, the 12-1322-RGA case.  Due to the Courts refusal to issue a summons so that Plaintiff can serve the ISPs immediately to preserve the evidence, Plaintiff was forced to borrow the money from his mother to pay for the Complaint due to its emergency status and the fact that Plaintiff is now facing a jail sentence due to the District Court's refusal to allow Plaintiff his ability to definitively establish the identities of the individuals sending him all these threatening communications.  Plaintiff can provide the Western Union receipts of the money transfer that paid for the Complaint, as Plaintiff has no money and has been incurring debt as a result of this case since it was filed.  It is almost as if all the Courts, the ISPs, the FBI are all part of some

massive gay conspiracy to deliberate frame Plaintiff and force him into a jail cell on false

charges.  Plaintiff's only question to the Court is what would you do if someone was threatening

your mother?  Go to the police?  Go to the Courts?  What happens if everyone ignores you and

you keep getting threats against your mother?  What are you supposed to do in that situation

when you already know who the source of the threats is?

99.  It is abundantly clear that the Defendants all who are supporting their activities are

attempting to entrap Plaintiff into an endless cycle of arrests, as all they need to cause Plaintiff to

be arrested over and over again, is to simply threaten the Plaintiff and/or his mother, and then run

to file false police reports against Plaintiff once he responds to the threats.  In that same April 7th

email threat to Plaintiff, it is clear that Simpson is threatening that they are actively plotting to

force the Plaintiff to spend the rest of his life in prison.  Plaintiff already informed Detective

Egan even after his arrest that he will continue to respond to Simpson's threats directly, each and

every time he receives or discovers one no matter how many times the Defendants can bribe

some corrupt cop to give them special services which are illegal for any police officer to provide.

There is no possible scenario where Simpson can be allowed to threaten Plaintiff and his family

with complete legal impunity simply because he is gay, yet every time Plaintiff responds to any

such threats he must be arrested because he is heterosexual.  In that situation, Plaintiff will

continue to be arrested over and over again for doing nothing more than defending himself from

threats originating from Simpson and the John Does, yet the John Does are being allowed to

threaten Plaintiff for reasons that the NYPD described as legally justified because they are

'retaliatory.'  April 7th Simpson threatens Plaintiff, April 16th Plaintiff responds.  As Plaintiff

said previously, it is already proven that Einstein was wrong and you cannot go back in time by

travelling faster than the speed of light.  How can an April 7th email be retaliatory to an April 16th

provocation?  Only if you wish to test the 'homosexual mathematics' model can you get an

answer to that particular question, because in the 'heterosexual mathematics' model, April 7th

comes before April 16th 100% of the time and time can never move backwards.

100.  It should be abundantly clear that it is not fair for any Court to automatically

assume that in any conflict, the gay must always be the victim and the heterosexual the

aggressor, simply because it is a political convenience to take such a position.  In this instance,

Plaintiff has suffered a brutal, 26-year long stalking campaign at the hands of a bunch of

obsessed homosexual pedophiles which has resulted in Plaintiff being subjected to violence and

being forced to respond in kind, and in the past 4 years alone the stalkers have filed no less than

5 different false criminal complaints, only one of which resulted in arrest just this past September

due to misconduct by all other entities that refused to restrain the Defendants when he begged for

assistance from the Police/Courts the entire 4 years he was being stalked.  All the law

enforcement entities, Courts, ISPs should be acting to prevent this conflict from proceeding, but

they are instead cheering for some violent grand-finale as if this matter was some sort of ancient

Roman Coliseum event where people are betting on who can kill who first.

101.  Plaintiff is not happy that he was forced by the John Does to disclose the nature of

Joseph McPhillips assasination in his attempts to defend against Mark Simpson, who is intending

to impose upon Plaintiff another 26 years of stalking if he could possibly manage it.  Plaintiff

doesn't want to engage violence against Simpson, but in the previous conflict with McPhillips,

the Moroccan and US government convinced Plaintiff that McPhillips could not be arrested due

to the fact that McPhillips successfully molested at least one distant member of the Royal

Family.  This type of attack by a homosexual upon a member of the Royal Family would normally be a death penalty offense, but since rape is not a death penalty offense in America, the Moroccan government knew that there would be substantial US government resistance to any Moroccan-government sanctioned legal execution of McPhillips.  So when the discussions concerning McPhillips fate were ongoing in Morocco upon Plaintiff's arrival in 2007, it was presented to Plaintiff that only a government authorized, secret execution could resolve all matters regarding McPhillip's crimes.

102.  Because McPhillips is no longer alive and able to respond to the reason why he was killed, Plaintiff is against the public disclosure of this assassination since McPhillips already paid for his crimes with his life.  Plaintiff is against forcing McPhillips to pay for his crimes twice, but the actions of the Defendants are such that there can be no repeat of McPhillips if it is at all possible.  For that reason, these John Does have thereby imposed harm upon the remainder of McPhillips family by forcing Plaintiff to publically disclose the nature of McPhillips assassination in an effort to force this matter with Simpson into a courtroom where it can be adjudicated in the proper forum.  So even within their own illegal conspiracy to harm Plaintiff, there are warring factions of gays which are deliberately turning on each other as the conspiracy continues to collapse into exposure.

103.  Plaintiff does not want to engage an internet war with these Defendants.  It is very easy for Plaintiff to place a website online describing the crimes committed by these people, and if Plaintiff markets this site to certain communities, it will cause a security hazard wherever Simpson and these John Does are located.  It is very dangerous for these individuals to find their case profiled publically on the internet without any tangible ability for the Defendants to dispute

the allegations within a Court of law, which is why Plaintiff has attempted every opportunity to give these Defendants the ability to have their issues, whatever they are, reviewed by a Court. The crimes for which they are accused in the Middle East are death-penalty eligible offenses. If they are not guilty of these offenses, they should respond to a Court to dispute them because a refusal to do so will be construed as an admission of guilt once the litigation opportunity closes. Even though they have claimed a fear of the Court process in Morocco, there is no reason why these Defendants would not get a fair Court process in Delaware or any other US jurisdiction, and filing false police complaints in an attempt to obtain leverage concerning ongoing civil litigation is not a new strategy, nor will it succeed in this matter.

104.   There is no need for these desperate Defendants to conspire to further trigger false criminal litigation in more favorable jurisdictions where they have supporters, especially when civil litigation concerning these matters has already been ongoing for years in Delaware while the Defendants continue to try and flee it. Even if these stalkers can force a bench-trial in the New York case and get a sympathetic judge willing to overlook everything that occurred leading up to April 16th, 2013, where the judge will only consider Plaintiffs communications while discounting all of Simpson's provocations, any false conviction derived in such a process in New York is clearly just another criminal attack against Plaintiff which is being facilitated by numerous parties and not just the Defendants. The Court should allow Plaintiff to collect evidence of his innocence of both the defamation and now the pending criminal allegations in New York, without any restrictions.

105.   This is a serious matter that should only be adjudicated inside a Courtroom. If the Defendants refuse to resolve the matter in Court, this thereby forces the conflict into extra-

57

judicial territory where the laws no longer matter, and the rules of the game become who you know and what favors you can pull.  Just like the Defendants, Plaintiff also knows corrupt NYPD officers who have actually assisted the mafia to expose witnesses and informants.  Plaintiff is not impressed that the Defendants can find a corrupt NYPD cop to assist them.  Plaintiff is more concerned that the Defendants also have tremendous sway over the Federal Courts, because the litigation in Delaware is still the most advanced legal forum that Plaintiff can find to mitigate this dispute.  If it cannot be mitigated in a Federal Court, then there exists no Court in the land where Plaintiff could obtain justice.

106.  So at the time of the filing of this First Amended Complaint, Plaintiff has numerous questions which he hopes to have answered via this litigation.  Some of these issues concern the equal application of the law.  Plaintiff is receiving numerous conflicting messages from many different law enforcement bodies concerning these issues, and he is being subjected to clearly criminal activity despite numerous law enforcement entities being apprised of this situation.  For example, after being arrested in New York by Detective Egan, Plaintiff was maliciously denied the ability to use the bathroom for almost 30 hours (as some sort of punishment for informing the detective that he intended to go to trial), resulting in the Plaintiff incurring a substantial injury in the form of an excruciatingly painful thrombosed internal hemorrhoid.  This injury was so substantial that Plaintiff went to a hospital three times since the arrest.  Plaintiff was even required to obtain surgery completely under anesthesia to repair the injury, and hospitals do not order surgery for patients that do not need it and have no medical insurance to pay for it, so the Court shouldn't just discount these issues as fabrications.  If ever there is something which the Court is requesting further documentation, the Court should never hesitate to ask.  Additionally,

58

Plaintiff lost a prospective job in Virginia as a result of the arrest (he can provide an affadivit from the prospective employer upon request), which thereby forced Plaintiff to return back to Florida under quite disastrous circumstances.  Due to the loss of Plaintiff's only job opportunity in several years of attempting to find employment, the little money which Plaintiff was borrowing from his family attempting to keep the litigation alive in Delaware in the hopes of restraining these people through a legal court process is now being allocated to give Plaintiff the ability to travel to New York for criminal court dates to keep up with the new malicious prosecution where Plaintiff is now facing a year in prison.  Plaintiff is already facing life in prison or death at the hands of these deranged individuals (as Plaintiff could have died in custody if he had not been released when he was, as the injury was substantial), and still the Court will be saying there is no emergency as these individuals continue to obtain protection for their activities from the Courts.

107.   While the District Court believes that there is no emergency inherent in Plaintiff's litigation (Order issued by Court on September 26th, 2013 stating there is no emergency as Plaintiff is sitting in a jail cell in New York being tortured by not being allowed to use a toilet while in custody, resulting in substantial physical injury).  Although the Court may have a high threshold for pain, Plaintiff is physically feeling the emergency in very substantial ways that the Court does not consider to be serious enough to constitute an emergency.  Plaintiff can provide his confidential medical records to the Court upon request, and the injury he sustained in the past month was easily the most prolonged, physically painful injury he ever sustained in his entire life, so Plaintiff is disputing this contention that there is no emergency.  Plaintiff is only now attaining the ability to sit and write a pleading about two weeks after the surgery.

108.   Upon return to Florida as a result of this his ambush with false arrest in New York, Plaintiff immediately wrote the FBI Agent who was claiming to investigate Simpson.  Plaintiff thereby threatened to harm him for causing Plaintiff yet another serious injury via their refusal to investigate/restrain Simpson, which is the second such substantial physical injury Plaintiff has sustained since the false prosecution of Plaintiff in Florida in 2005-2006 (which occurred under nearly identical circumstances of Federal/State collaboration on misconduct).  Plaintiff has not been arrested for threatening the FBI and threatening to kill the current (and former) President of the United States as a result of their deliberate obstruction of the 911 investigation, yet the minute Plaintiff responds directly to death threats he is obviously receiving from Simpson with warnings of his own, he is arrested.  So it is legal for Plaintiff to threaten to kill the FBI and the President for protecting Simpson, yet illegal for Plaintiff to threaten Simpson for stalking him and his family due to refusal of the State/Federal police to restrain Simpson.  Nothing makes sense.  Plaintiff has borrowed the money to pay for this litigation even though he cannot afford it, and he hopes that at least this time, the Court can answer some of these questions so that Plaintiff can at least be better apprised of the law moving forward.

109.   Plaintiff also assassinated Joseph McPhillips in Morocco for his crimes against Plaintiff and others, and this extrajudicial assassination is legally acceptable to both the US and Moroccan governments, yet it is somehow illegal for Plaintiff to respond to Simpson's threats with the warning email attached as Exhibit 43.  If the malicious prosecution in New York is intended to be punishment of Plaintiff by the US government for having disclosed the details of the McPhillips assassination, then this is also not acceptable to Plaintiff because he always

preferred that McPhillips be arrested rather than assassinated and he expressed this many times to them but the refused to intervene and address it.

110.  All these malfunctions raise serious questions.  Is it legal for Plaintiff to just assassinate the John Does in secret as he did with McPhillips, yet illegal for him to threaten them in public?  What exactly are the legal boundaries that restrict the actions of the Defendants, and why are those same legal boundaries different for Plaintiff?  The Defendants have sent dozens of threatening communications, messages, splashed blood on Plaintiff's home in Morocco, and again just recently sent Plaintiff threatening communications directly and even managed to spy on Plaintiff's mother in Morocco and threaten her too by placing simulated blood atop the roof of her car.  Plaintiff responded to all these provocations with a warning email on April 26th, 2013 for which he was arrested.

111.  Defendants posted on the internet thousands of posts, communications, and have even published/sold books on Amazon.com attempting to incite violence against the Plaintiff, yet Plaintiff only sparingly responded by posting a one paragraph website mocking their actions, and the website is only a place-holder for the moment until Plaintiff can fully understand the legal boundaries of this dispute through the litigation before expanding his defenses.  If Plaintiff were to set up a website fully documenting and informing the public of crimes committed by the John Does, including their addresses, photos and identifying information, evidence, police reports, lawsuits and other matters, as a means by which to warn the public concerning the pedophilic proclivities of these individuals and their intention to attempt to infect people with HIV, is that an acceptable resolution to the problem that the Defendants are willing to accept?

112.  What if Plaintiff were to continue to perform the exact same actions that Simpson is performing, such as expanding his website to expose the actions of these Defendants to a much larger audience than just this Court and a few solitary government agencies?  What if plaintiff were to market this website on a large scale and populate it with an explanation concerning how Simpson was negatively impacting the ability of Plaintiff to obtain an investigation of Sheikh Rahman's case.  This type of website, no matter the fact that it is completely legal as Plaintiff is merely describing the truth (although it is nearly impossible for Plaintiff to rely on the laws as codified because they are not equally implemented), would immediately create a security hazard for the Defendants (and the governments that host them) by placing them and anyone within their vicinity in potential danger due to the fact that these individuals will end up targeted by the people that they harmed.  Plaintiff is against this approach because he genuinely believes that the Defendants suffer from mental disorders and are in need of hospitalization for their issues.  In the blog entries the Defendants claim that they have been contemplating suicide due to their depression or 'post traumatic stress' and Plaintiff believes that they are deliberately attempting to commit 'suicide by cop' due to depression, which is why they are obsessed with provoking Plaintiff to harm them.  Regardless of whatever mental disorders that they suffer from, Plaintiff is trying to temper justice with mercy, but he cannot simply accept to be abused by the Defendants indefinitely in the very violent way that they are engaging, just because they suffer from mental disorder and should thereby be 'absolved' of responsibility for their actions.

113.  If the Defendants are allowed to place websites online containing false information that they are hoping will incite violence against Plaintiff, is Plaintiff thereby allowed to place websites online containing true information which will absolutely incite violence against the

Defendants?  Is it the intent of the actions which are illegal, or the result?  At what point should a law enforcement or government agency act to prevent possible 'accidents' that can lead to violence?  If Plaintiff feels that this matter is hazardous enough to institute litigation to try an neutralize it, why would the Courts chose to attempt every possible means to reject the litigation, rather than simply perform the very common, rudimentary legal procedures to provide Plaintiff with the ability to prevent an accident before it happens?  If the Courts reject this litigation, and additional people end up being killed because of it (either Plaintiff, Defendants or other innocent people), then who gets charged and who bears the responsibility for such a result?

114.  Additionally, and as a result of the FBI's botched 911 investigation, Plaintiff has succeeded in threatening Al-Qaeda core into refraining from attempting any further operations against the American homeland.  Through a very complicated set of circumstances, Plaintiff has single-handedly secured a temporary ceasefire agreement from the original Al-Qaeda network headed by Osama Bin Laden and the Pakistani ISI, and Plaintiff was able to continue to secure their adherence with this agreement despite numerous attempts by the FBI to try and scuttle the agreement, including an event where Plaintiff's friend in Pakistan was assassinated after taking photos of Bin Laden's compound for Plaintiff in 2010 (an RIP Facebook page concerning this victim is attached as Exhibit 48).  Plaintiff was still able to maintain the ceasefire even after the US government assassinated Bin Laden just days after they failed to prevent the imminent Marrakesh bombing, which Plaintiff also attempted to warn them about.  Plaintiff is engaged in a competition with the FBI to prevent terrorism, and they are unlawfully engaged in a counter-operation to thwart Plaintiff's efforts because Plaintiff is more successful in protecting the American homeland from attack than they are, as is evidenced by the fact that there has not been

another major attack inside America since Plaintiff secured the ceasefire following the 911

attacks.  It is also clear from the events which occurred in Egypt that led to the kidnapping of the

7 French citizens (and the attack against the US Embassy in Benghazi, Libya) that these militants

are still very desirous and capable of engaging violence to defend their continued efforts to

prevent the obstruction of the 911 investigation, regardless if Plaintiff demands that they refrain

from violence.  Still, Plaintiff will continue to communicate with the militants because they still

provide him with warnings of impending terrorist attacks, and Plaintiff does not want to lose

access to these warnings which he receives from time to time and communicates to the FBI every

time he receives them.  The problem is that Plaintiff can no longer physically handle the strain of

continuing to pursue a legal remedy to this problem (especially with additional litigation being

forced upon Plaintiff by political gay activists who are also attempting to scuttle Plaintiff's

ceasefire efforts).

115. Plaintiff knows that once he informs the militants that he will withdraw from

involvement with the matters concerning Sheikh Omar Abdel Rahman, this will also guarantee

that the militants loyal to Rahman will therefore abandon the ceasefire that Plaintiff negotiated

since 2001.  Plaintiff assumes that this will therefor result in violence, so the only way that

Plaintiff can mitigate this certainty is to attempt to direct the violence against whatever parties

are responsible for forcing Plaintiff to drop his attempted to pursue a resolution to the case of

Sheikh Rahman (if this is at all possible), and to at least ensure (to the best of Plaintiff's ability)

that innocent people are not harmed as a result of the actions of a few criminals in government.

116.  Plaintiff can no longer sustain multiple threads of litigation and another indefinite

stalking campaign, along with another false malicious criminal prosecution, while at the same

time continuing to pursue efforts to resolve the matter with Sheikh Rahman.  Although the matter

with Sheikh Rahman poses the most significant security threat to the United States, Plaintiff

would be stupid to continue to expend his own personal time and resources attempting to

continue to prevent terrorism when the FBI/NYPD is exhaustively attempting to provoke

Plaintiff into endorsing terrorism by constantly assaulting him and/or allowing others to assault

Plaintiff with complete legal impunity so that unsuspecting idiots like Simpson can be framed for

crimes actually committed by law enforcement.

117.  Plaintiff has already informed the Federal Government that he must eventually give

a final answer to the militants who are awaiting Plaintiff's final report concerning these matters.

The problem that Plaintiff is facing at this juncture, is that he must be able to also exclude the

United States/French governments from involvement with the Defendants activities, as it may

also be possible (however unlikely) that these governments are the ones making the threats and

are attempting to frame Mark Simpson to take the fall for their 12 years of misconduct, when

Simpson was only present during the past 4 years of misconduct.  Plaintiff thereby attempts this

litigation to properly understand the nature of these communications, who is making them, and

why.  There are claims in the blogs that the account holders were stalked/framed by Plaintiff, but

absent Plaintiff's ability to question the ISPs or these individuals directly (either through

civil/criminal litigation), Plaintiff cannot confirm the veracity of such statements.

118.  Although Plaintiff is highly skeptical that the America/French governments are

conspiring with each other to frame the Defendants as a 'gay terrorists,' the mere fact that there

is already substantial involvement of numerous governments in this matter make it possible that

these governments could also be attempting to frame Mark Simpson and all gay people on Earth

as followers of the antichrist, in much the same way they apparently had a plot to try and frame

Plaintiff and all Muslims as followers of the antichrist after the 911 attacks.  Although it is highly

unlikely that the FBI or French government are the source of the communications cited in this

Complaint, Plaintiff takes violence very seriously and there can be no mistaken identity issues

concerning the identities of these persons who are interfering in Plaintiffs attempts to maintain a

terrorist ceasefire.  There should also be no ability left for Mark Simpson to be able to falsely

claim that he is being framed by any government, because in that scenario Simpson can actually

provoke retaliation by the militants against innocent citizens of whatever government he intends

to implicate, as he did with the 7 French citizens which he caused to be kidnapped by claiming

that the French government was assisting him with his attempts to frame Plaintiff with crimes.

119.  Plaintiff is submitting this pleading under special circumstances with information

directly relevant to the dispute, although it may be a departure from the main focus of the instant

case, which is a defamation case.  Plaintiff must do this at this juncture because the uncertainty

of this situation is such that Plaintiff can be illegally arrested/detained at any time for no viable

legal reason, which is why the focus of this litigation (as a result of the NY arrest) has shifted

from attempting to neutralize the activity via litigation, to simply documenting as much of the

conflict as Plaintiff can manage before such time as when this so called 'non-emergency'

litigation results in some additional unforeseen surprises.  If these dysfunctions continue to occur

between all these disputing agencies, and somehow there is another collapse which could

provoke a terrorist attack on the level of 911 or greater, Plaintiff will clearly be unable to respond

to provide any further evidence concerning why this event has occurred as it is clear that the US

government intends to illegally hold him incommunicado to prevent the facts from being made

66

public, so this record of litigation between the Florida and Delaware cases will likely be the only unrestricted access that the Courts will ever acquire concerning this top-secret matter.

120.   The District Court should also know that during Plaintiff's recent travels this year, he travelled through multiple countries despite acquiring top-secret information from numerous governments involved in this affair.   For example, when Plaintiff discovered that the British Consul in Morocco was involved in the plot to attempt to frame Plaintiff for terrorism, Plaintiff thereby acquired a database of British Embassy communications confirming the frame-up plot. Upon Plaintiff's return to the United States and one month before the imminent Marrakesh terrorist attack, Plaintiff contacted the British government to inform them that he acquired evidence of complicity by their Consul in the plot to frame Plaintiff with terrorism in Morocco. They responded by firing the British Consul but never attempted to retrieve their communications from Plaintiff.

121.   Upon travelling to Britain this year, Plaintiff was subsequently subjected to a scene at Heathrow airport whereby the British Intelligence stopped the Plane on the tarmac after Plaintiff arrived and escorted him off the Plane for questioning.   Plaintiff was not arrested for acquiring this database of British Embassy communications because it contained evidence of crimes being committed against Plaintiff and others.   Plaintiff was thereby released from British custody and allowed to continue to his connecting flight without incident.   Samples of emails and documents acquired from the database are attached as Exhibit 49, including an email concerning security protocols, and a sample entry from their passport database (redacted).   The Court should be clear that Plaintiff is not fabricating any of these issues, as there are many governments being affected by this scandal concerning Simpson.   Plaintiff also has substantial evidence to support

his claims, but he has only offered to provide this evidence to the FBI directly.  The FBI has

refused to interview Plaintiff about any of this (since even before 911), but just recently when

Plaintiff requested permission from the FBI to report this information to foreign governments,

they responded by claiming that any attempt to do so will be seen as an act of espionage against

the United States (even though the information would immediately help prevent terrorism which

is also affecting people outside America in very significant ways).  As a result, Plaintiff is in a

conflict with the FBI concerning the very definition of what it means to be an American, and

unfortunately the FBI is losing this conflict because you cannot obstruct a terrorism investigation

and call yourself an American at the same time.  911 was not some game, at least not for the

people who went through it.

xx.  Attached as Exhibit 50 is the Police Complaint from the New York case.  In the New

York police complaint, Mark Simpson deliberately provided his name to the police as Mark

Sherman, even though Sherman is not his last name but his middle name.  Attached as Exhibit 51

is Plaintiff's response to the FBI concerning his arrest by the NYPD.  Attached as Exhibit 52 is

Plaintiffs email to Amazon/Google offering to drop the case if they provide the information,

which they refuse.  Plaintiff is thereby filing a Motion to Stay litigation contemporaneous with

this Complaint, and a Motion to issue subpoena to allow Amazon/Google/Yahoo to respond to

the request for information via subpoena if they are against providing this information via

lawsuit.  Either way, the ISPs must first respond to the request for information before Plaintiff

can review the evidence to determine if they are in any way complicit with causing these events

to occur.  Only by reviewing the ISP logs can he confirm/deny if they are unlawfully assisting

the John Does in any way.

## AS AND FOR A FIRST CLAIM

### Declaratory and Injunctive Relief

122.  Plaintiff repeats the averments of paragraph 1 through 38 as if fully set forth herein.

123.  By reason of the foregoing, the John Doe Defendants malicious defamation and threatening communications, which they caused to be published via the ISP Defendants internet facilities, constitute libel per se for which all Defendants are answerable for damages under Delaware State law.

124.  That this Court order ISP Defendants, Google Inc., Amazon Inc. and Yahoo Inc. to immediately provide to Plaintiff all evidence in their possession that will help identify the John Does defaming and threatening Plaintiff via their facilities.  Plaintiff also asks this Court to order the ISPs to provide the IP/Mac Address used to publish each defamatory communication cited in this complaint.  If an IP/Mac Address address used by a John Doe to publish a defamatory article cited in this Complaint is not sufficient to identify the John Doe, then the Court should order the ISPs to also provide any information given to register the accounts with the ISPs, or any other information that could help identify the publisher of each individual communication, as preliminary investigation by Plaintiff concerning possible IP addresses involved in the defamation indicate that there are multiple Defendants spread out over several countries.  The Court should also order the ISPs to provide Plaintiff any statistical information gathered by them concerning each defamatory communication, including the number of hits for each webpage, locations (but not identities) of viewers, number of defamatory books sold and income generated.

125.  In the event that the ISPs are not in possession of any records that could help to identify the John Does that operated these accounts, that this Court immediately order ISPs to

disclose to Plaintiff all external entities that had access to their equipment to be able to

intercept/record data related to the accounts identified in this Complaint, and to disclose any

cooperation between ISPs and external entities, including but not limited to government

agencies, where the cooperation allows these external entities the ability to also capture data

streams passing through the ISPs that could identify John Doe defendants which are defaming

and making threats against Plaintiff.

### AS AND FOR A SECOND CLAIM

### Tortious Interference with Contract

126.  Plaintiff repeats the averments of paragraph 1 through 38 as if fully set forth herein.

127.  By reason of the foregoing, John Does are tortuously interfering with a previous

settlement contract reached between Plaintiff and AST in case number 10-431-RGA by

attempting to induce both parties into violating the Contract which cannot sustain under

Plaintiff's inability to obtain information concerning the identity of the John Does defaming and

threatening him.  ISP Defendants are also engaging tortious interference with the contract if they

do not immediately act to provide all information necessary to identify the John Doe Defendants.

128.  Plaintiff is requesting $1,000,000 from the John Doe Defendants for tortuously

interfering with this previous settlement agreement, which has cause Plaintiff to incur substantial

damages to his ability to return to Morocco due to the collapse of the settlement causing Plaintiff

to once again fall into conflict with the Moroccan military due to matters related to this litigation.

129.  In the event that the ISP Defendants are unable to provide identifying information

concerning the John Does that operated accounts they hosted which are the subject of this

Complaint, or if the ISPs are found to be negligent in their obligation to maintain records of

70

individuals that use their facilities to publish material onto the internet, Plaintiff is thereby

requesting an additional $1,000,000 from the ISPs for tortious interference with Plaintiff's

settlement contract due to the fact that their products are defective by virtue of being designed in

any way that does not take every reasonable step to minimize the ability of anonymous

individuals being able to use these advanced internet media publication products to post

anonymous defamation.

**AS AND FOR A THIRD CLAIM**

**Negligent and Intentional Infliction of Emotional Distress**

130.  Plaintiff repeats the averments of paragraph 1 through 38 as if fully set forth herein.

131.  By reason of the foregoing, the actions of the ISP Defendants in failing to secure

their facilities to prevent John Does from publishing false and defamatory communications

concerning Plaintiff constitute negligent infliction of emotional distress.  The ISP Defendants

should not allow any individuals the ability to publish articles using their facilities, without first

verifying that the content of the published material is not defamatory.  In the event that the ISP

Defendants are also found to be negligent in their duty to verify, to a reasonable standard, the

identity of users of their advanced blog products, the actions of the ISP Defendants would also

be negligent in allowing users the ability to operate a blog in such a manner whereby a user

cannot be directly identified for service of process in the event such a user publishes defamatory

content that the ISP Defendants are not capable of screening before final publication is made via

the ISP's facilities.  Plaintiff is willing to forgo any financial compensation from the ISP

Defendants in the event they are able to produce evidence that can identify the John Doe

Defendants, but in the event that they are found unable to produce any evidence concerning the

71

identities of the John Doe defendants because they failed to implement procedures (such as telephone verification), before allowing users to register accounts such as the ones cited in this Complaint, then Plaintiff is requesting $1,000,000 from the ISP Defendants as compensation for Negligent Infliction of Emotional Distress.

132.  Plaintiff is also requesting $1,000,000 in damages for Intentional Infliction of Emotional Distress from the John Doe Defendants, because it is clear that their actions are deliberate, intentional and designed to harm the defendant with violence if possible.

## AS AND FOR A FOURTH CLAIM

### Damages for Libel per se

133**.**  Plaintiff repeats the averments of paragraph 1 through 38 as if fully set forth herein.

134.  By reason of the foregoing, John Doe Defendant's malicious and willful defamatory published statements have damaged the Plaintiff and are actionable for damages under the law of the State of Delaware.

135.  Accordingly John Doe Defendants should be held liable for damages to the Plaintiff in a sum exceeding $75,000 and yet to be determined by a jury.

136.  In the event that the ISP Defendants are unable to provide Plaintiff any information concerning the proper identities of the John Doe Defendants, Plaintiff is also asserting that the ISP Defendants are additionally liable for damages to the Plaintiff for libel in a sum exceeding $75,000 and yet to be determined by a jury.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully demands this court enter judgment in its favor and against Defendant Simpson as follows:

1.  Ordering the ISP Defendants to immediately provide all evidence in their possession that will identify the John Doe Defendants, and enjoining the ISP Defendants from allowing the John Doe Defendants any future access to their facilities, and ordering the ISP Defendants and the John Doe Defendants to immediately remove any remaining defamatory statements still contained on the offending products, and ordering the ISP Defendants and/or the John Doe Defendants to print retractions of their Defamatory publications, and to remove from sale any novels containing defamatory allegations attributable to the Plaintiff.

2.  Awarding on the Second and Third Claim for such compensatory and punitive damages for the Defendants tortious interference with the 2012 Contract in the sum of at least $1,000,000.

3.  Awarding on the Fourth Claim, such compensatory and punitive damages, inter alia for emotional distress/loss of reputation of at least $1,000,000, or any sum as jury may impose.

4.  Granting such other and further relief as the Court deems just and proper, including the costs of this action and investigative costs associated with gathering evidence in this case.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b) Plaintiff hereby respectfully demands a trial by jury of all issues triable of right by a jury.

Respectfully submitted this 12th day of November, 2013

 **/s/   Younes Kabbaj_____**
Younes Kabbaj PRO SE
1844 N Nob Hill Rd #222
Plantation, FL 33322
jonahkabbaj@gmail.com
561-223-9777

73

CERTIFICATE OF SERVICE

I, Younes Kabbaj, hereby certify that a copy of the foregoing FIRST AMENDED COMPLAINT was served today upon all Defendants via ECF:

Executed November 12th,  2013

/s/ Younes Kabbaj
Younes Kabbaj PRO SE
1844 N Nob Hill Rd #222
Plantation FL 33322
jonahkabbaj@gmail.com
561-223-9777